IN THE MATTER OF: APPEAL OF BLUE RIDGE MALL LLC FROM THE DECISIONS OF THE HENDERSON COUNTY BOARD OF EQUALIZATION AND REVIEW CONCERNING THE ASSESSMENTS OF REAL PROPERTY FOR TAX YEAR 2007

No. COA10-1487

(Filed 2 August 2011)

**1. Taxation—valuation—rebuttable presumption of correctness**

A *de novo* review revealed that the North Carolina Property Tax Commission did not err by concluding a taxpayer rebutted the presumption of correctness by producing competent, material, and substantial evidence tending to show the County used an arbitrary or illegal method of valuation, and the County's assessment substantially exceeded the true value in money of the property.

**2. Taxation—capitalization rate—not arbitrary or capricious**

A whole record review revealed that the North Carolina Property Tax Commission's use of a 10% capitalization rate was supported by the evidence and was not arbitrary or capricious.

**3. Taxation—valuation—retention pond parcel**

The North Carolina Property Tax Commission did not err by its valuation of a 5.15-acre retention pond parcel. The Commission assigned the same value as the County.

Appeal by Henderson County and Blue Ridge Mall LLC from final decision entered 18 June 2010 by the North Carolina Property Tax Commission. Heard in the Court of Appeals 25 April 2011.

*Parker Poe Adams & Bernstein LLP, by Charles C. Meeker and Jamie S. Schwedler, for Henderson County-appellant.*

*Bell, Davis & Pitt, P.A., by John A. Cocklereece, Jr., D. Anderson Carmen, and Justin M. Hardy, for Blue Ridge Mall LLC-appellant.*

*North Carolina Association of County Commissioners, by Sharon Scudder, General Counsel, amicus curiae.*

MARTIN, Chief Judge.

Blue Ridge Mall LLC (the taxpayer) and Henderson County (the County) appeal from the final decision of the North Carolina Property Tax Commission (the Commission), which valued the subject prop-

erty (the property) for the tax year 2007 at $9,461,476. The taxpayer's property consists of two parcels of land located at 1800 Four Seasons Boulevard in Hendersonville, North Carolina. One parcel, comprised of approximately 5.15 acres, is currently used as a retention pond and the other, comprised of approximately 24.19 acres, is improved with a commercial mall, the Blue Ridge Mall. Anchoring the south end of the Blue Ridge Mall is a Belk store. Belk owns the portion of the mall housing its store as well as the underlying land, and Belk's parcel physically separates the 5.15-acre parcel from the 24.19-acre parcel.

· Effective 1 January 2007, the County appraised the market value of the 24.19-acre parcel at $11,696,700 and the 5.15-acre parcel at $201,900.[1] In response to interrogatories, the County stated that it had used the cost approach to value the property "as set forth in its schedule of values." The County stated that the land values in its schedule of values are based on comparable sales and that the building values in its schedule of values are based on "base costs, adjustments for various features and depreciation."

The taxpayer appealed the County's assessment to the Henderson County Board of Equalization and Review and the assessment was confirmed. The taxpayer appealed to the Commission, sitting as the State Board of Equalization and Review, and the matter was heard in December 2009.

Before the Commission, the taxpayer offered into evidence an appraisal report prepared by Paul G. Carter Jr., MAI SRA, a commercial real estate appraiser. Mr. Carter's report explained, "Income-producing properties are typically purchased by investors for the earnings that they are capable of producing." Because the income capitalization method "is by far the most applicable and reliable method of valuing multitenant [sic] income-producing properties like the subject," he used the income capitalization method in his valuation. Mr. Carter concluded that the property's market value as of 1 January 2007 was $7,735,000.

In June 2010, the Commission entered a final decision, making the following relevant findings:

> 5. Henderson County is required to value all property for *ad valorem* tax purposes at its true value in money, which is "market

---

1. The exhibits on appeal and the Commission's findings indicate the County subsequently amended the assessed value of the 24.19-acre tract, with a total final valuation of $11,496,600; the land was valued at $5,174,300 and the improvements at $6,322,300.

value." N.C. Gen. Stat. 105-283 . . . . Market value is defined in the statute as:

> "The price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used." Id.

6. An important factor in determining the subject property's market value is its highest and best use. The highest and best use of the subject property is its present use as an enclosed regional mall.

. . . .

8. The Commission recognizes that the [taxpayer's] appraiser[, Paul G. Carter, Jr. MAI, SRA,] prepared an appraisal report wherein he only used the income capitalization approach to estimate his opinion of value for the subject property. . . .

9. When relying upon the income capitalization approach, the [taxpayer's] appraiser reached an estimated opinion of value of $7,735,000 for the subject property, effective January 1, 2007. Mr. Carter arrived at his estimated opinion of value as follows:

> Stabilized net operating income (NOI) excluding real estate taxes:$993,455
>
> Divided by the tax-loaded overall capitalization rate: 0.12842

10. Of the sales information contained in his appraisal report, Mr. Carter relied upon the Mayberry Mall sale that occurred on December 28, 2007 to determine his overall capitalization rate of 12%. Mr. Carter made no adjustments to his overall capitalization rate due to the age of the Mayberry Mall property (The Mayberry Mall property is fifty percent (50%) older than the subject property) and the sale of this property occurred after the January 1, 2007 reappraisal date.

11. Of the three accepted appraisal approaches to value, namely the cost approach, comparable sales approach, and income capitalization approach, an appraiser should consider all three appraisal approaches to value as long as the income approach is given the greatest weight to determine the market

value for income-producing property. When arriving at the fair market value for the subject property, an appraiser may consider the cost approach or a combination of the three approaches to value the property, but the appraiser's reliance upon the income capitalization approach is most appropriate to determine the subject property's market value as of January 1, 2007.

12. Henderson County did not assess the subject property at its market value as of January 1, 2007 when it did not rely upon the income capitalization approach to value the property. As such, the most reliable appraisal method to determine the market value for the subject property is the income capitalization approach.

13. There are two methods under the income capitalization approach (direct capitalization or yield capitalization (discounted cash flow analysis) [sic] that are used in appraising income-producing properties. For purposes of this appeal, the direct capitalization method is most appropriate because it is the method commonly used by investors in the region where the subject property is located.

14. The direct capitalization method considers net operating income at only one point in time. As of January 1, 2007, the subject property's stabilized net operating income (NOI) excluding real estate taxes was $993,455. When considering all the evidence an overall capitalization rate of 10.5% is most appropriate to determine the market value of the subject property as of January 1, 2007. When the subject property's net operating income of $993,455 is divided by the overall capitalization rate of 10.5%, the total market value for the property subject to this appeal was $9,461,476 as of January 1, 2007; $201,900 for the retention pond parcel . . . and $9,259,576 for [the Blue Ridge Mall parcel].

(Footnotes omitted.) It then entered the following conclusions,

1. Ad valorem assessments are presumed to be correct. When assessments are attacked or challenged, an appellant is required to produce evidence that tends to show that the County relied on an illegal or arbitrary valuation method and that the assessment substantially exceeds true value of the property.

2. After the appellant produces such evidence as outlined above, the burden of going forward with the evidence and of persuasion that its methods would in fact produce true value then

rests with the County; and it is the Commission's duty to hear the evidence of both sides, to determine its weight and sufficiency and the credibility of witnesses, to draw inferences, and to appraise conflicting and circumstantial evidence, all in order to determine whether the County met its burden.

3. After considering all the evidence, the exhibits and all matters of record and after determining its weight and sufficiency and the credibility of witnesses, and appraising conflicting and circumstantial evidence, the Commission concludes that Henderson County did not properly assess the subject property at its market value and that the total valuation of the subject property was $9,461,476, as of January 1, 2007.

(Footnotes omitted). Accordingly, the Commission ordered that the County revise its tax records to reflect the Commission's findings and conclusions. The taxpayer and the County filed timely notices of appeal from the Commission's decision.

---

It is a "sound and a fundamental principle of law in this State that ad valorem tax assessments are presumed to be correct." *In re AMP Inc.*, 287 N.C. 547, 562, 215 S.E.2d 752, 761 (1975). However, a taxpayer may rebut this presumption by producing "competent, material and substantial evidence that tends to show that: (1) [e]ither the county tax supervisor used an arbitrary method of valuation; or (2) the county tax supervisor used an illegal method of valuation; and (3) the assessment substantially exceeded the true value in money of the property." *Id.* at 563, 215 S.E.2d at 762 (citing *Albemarle Elec. Membership Corp. v. Alexander*, 282 N.C. 402, 410, 192 S.E.2d 811, 816-17 (1972)) (emphasis omitted). In attempting to rebut the presumption of correctness, the burden upon the aggrieved taxpayer "is one of production and not persuasion." *In re IBM Credit Corp.*, 186 N.C. App. 223, 226, 650 S.E.2d 828, 830 (2007), *aff'd per curiam*, 362 N.C. 228, 657 S.E.2d 355 (2008). Once a taxpayer produces sufficient competent, material and substantial evidence to rebut the presumption of correctness, the burden of proof then shifts to the taxing authority and the taxing authority must demonstrate its methods produce true value. *In re S. Ry. Co.*, 313 N.C. 177, 182, 328 S.E.2d 235, 239 (1985).

N.C.G.S. § 105-345.2(b) provides that, in reviewing the Commission's final decision, this Court

may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceed-

**IN RE APPEAL OF BLUE RIDGE MALL, LLC**

[214 N.C. App. 263 (2011)]

ings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions; or

(2) In excess of statutory authority or jurisdiction of the Commission; or

(3) Made upon unlawful proceedings; or

(4) Affected by other errors of law; or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or

(6) Arbitrary or capricious.

N.C. Gen. Stat. § 105-345.2(b) (2009).

[1] The County first contends the taxpayer failed to rebut the presumption of correctness by producing competent, material and substantial evidence tending to show the County used an arbitrary or illegal method of valuation and the County's assessment substantially exceeded the *true value in money* of the property. We disagree.

N.C.G.S. § 105-317 provides that,

(a) Whenever any real property is appraised it shall be the duty of the persons making appraisals:

(1) In determining the true value of land, to consider as to each tract, parcel, or lot separately listed at least its advantages and disadvantages as to location; zoning; quality of soil; waterpower; water privileges; dedication as a nature preserve; conservation or preservation agreements; mineral, quarry, or other valuable deposits; fertility; adaptability for agricultural, timber-producing, commercial, industrial, or other uses; past income; probable future income; and any other factors that may affect its value except growing crops of a seasonal or annual nature.

(2) In determining the true value of a building or other improvement, to consider at least its location; type of construction; age; replacement cost; cost; adaptability for residence, commercial, industrial, or other uses; past income; probable future income; and any other factors that may affect its value.

. . . .

(b)  In preparation for each revaluation of real property required by G.S. 105-286, it shall be the duty of the assessor to see that:

(1)  Uniform schedules of values, standards, and rules to be used in appraising real property at its true value and at its present-use value are prepared and are sufficiently detailed to enable those making appraisals to adhere to them in appraising real property.

N.C. Gen. Stat. § 105-317 (2009).

The County argues that because it used its 2007 schedule of values when it appraised the property, which was required by N.C.G.S. § 105-317, and because, after the County's initial appraisal, it visited the property and used the income and sales comparison methods to show that its initial assessment was correct, the taxpayer failed to overcome the presumption of correctness of the County's assessment. The County contends N.C.G.S. § 105-317 "require[s] County assessors to value land and buildings separately." The County also contends "it is not possible, as a practical matter, to undertake individual income approaches and sales comparison analyses for each . . . income-producing property during the initial mass appraisal."

N.C.G.S. § 105-317 requires that appraisers determine the "true value" of real property as those words are defined in N.C.G.S. § 105-283.

[T]he words "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

N.C. Gen. Stat. § 105-283 (2009). "An illegal appraisal method is one which will not result in 'true value' as that term is used in [N.C.G.S.] § [105-]283." *In re S. Ry. Co.*, 313 N.C. at 181, 328 S.E.2d at 239. Since " '[a]n illegal appraisal method is one which will not result in true value as that term is used in [N.C.G.S. § 105-283],' it follows that such method is also arbitrary." *In re Lane Co.*, 153 N.C. App. 119, 124, 571 S.E.2d 224, 227 (2002). In appraising the true value of real property, N.C.G.S. § 105-317 "has been interpreted as authorizing three methods of valuing real property: the cost approach, the comparable sales

approach, and the income approach." *In re Greens of Pine Glen Ltd.*, 356 N.C. 642, 648, 576 S.E.2d 316, 320 (2003). However, "the general statutes nowhere mandate that any particular method of valuation be used at all times and in all places." *Id.* "The statute contemplates that the assessors and the Commission will consider which factors [in N.C.G.S. § 105-317] apply to each specific piece of property in appraising its true value." *Id.* at 648-49, 576 S.E.2d at 321; *In re Ad Valorem Valuation*, 282 N.C. 71, 80-81, 191 S.E.2d 692, 698 (1972) ("Not every attribute specified in G.S. 105-295 is applicable to every piece of property in the county."). N.C.G.S. § 105-317 "expressly directs that consideration be given to the income producing ability of the property where appropriate. Obviously, this is an element which affects the sale of properties, the purpose of which is the production of income." *Id.* at 80, 191 S.E.2d at 698. "To conform to the statutory policy of equality in valuation of all types of properties, the statute requires the assessors to value all properties, real and personal, at the amount for which they, respectively, can be sold *in the customary manner in which they are sold*." *Id.* (emphasis added). "An important factor in determining the property's market value is its highest and best use." *In re Belk-Broome Co.*, 119 N.C. App. 470, 473, 458 S.E.2d 921, 923 (1995), *aff'd per curiam*, 342 N.C. 890, 467 S.E.2d 242 (1996). "It is generally accepted that the income approach is the most reliable method in reaching the market value of investment property." *Id.* at 474, 458 S.E.2d at 924.

The taxpayer offered into evidence Mr. Carter's appraisal report, which stated the following: "The highest and best use of the property, as improved, is to continue maintaining the subject's existing improvements as an enclosed shopping mall." The income capitalization approach "is by far the most applicable and reliable method of valuing multitenant [sic] income-producing properties like the subject." Typically, "commercial real estate investors and brokers use only the income capitalization approach to analyze existing regional malls, like the subject, because this valuation approach directly reflects their investment thinking." The sales comparison approach "is much less applicable and reliable for this type of property" and the cost approach "would be practically meaningless for valuing the subject."

Using the income capitalization method, Mr. Carter capitalized the property's estimated potential net operating income of $993,455 with a rate of 12.842% and valued the property at $7,735,000. In response to interrogatories, the County stated that it had initially appraised the property using the cost approach, valuing the land

based on comparable sales and the building based on base costs, adjustments for various features, and depreciation. Contrary to the County's arguments, the taxpayer offered competent, material and substantial evidence tending to show the County, by employing an appraisal method which did not result in the property's true value in money, used an illegal or arbitrary method of appraisal, and, that the method used resulted in an assessment that substantially exceeded the true value in money of the property. *See In re AMP Inc.*, 287 N.C. at 563, 215 S.E.2d at 762.

Furthermore, we note that, on at least two occasions, this Court has rejected the argument that reliance on a schedule of values precludes a taxpayer from overcoming the presumption of correctness of a property tax appraisal.

In *In re Lane Company*, 153 N.C. App. at 124-25, 571 S.E.2d at 227-28, in response to a county's "reli[ance] on its schedule of values to show the assessment [wa]s not arbitrary," we noted that, "[a]lthough the schedule of values shows an objective process in the county's valuation procedures as a whole, it does not prove that the valuation and assessment of the subject property was itself not arbitrary" and held that a "schedule of values standing alone does not support reversing the Commission's ruling that the valuation method employed by the county was arbitrary." Similarly, in *In re IBM Credit Corporation*, ___, N.C. App. ___, ___, 689 S.E.2d 487, 494 (2009), we recognized that, "if [the contention that the schedule used by all 100 counties produces true value] prevails, then tax appeals would simply be limited to determining whether or not the proper government schedule was employed" and noted that "[t]his is not what is contemplated in the burden shifting analysis required by this Court."

Thus, there is no merit to the County's argument that use of its schedule of values necessitates the conclusion that the taxpayer failed to rebut the presumption of correctness. *See id.; In re Lane Co.*, 153 N.C. App. at 125, 571 S.E.2d at 228.

There is also no merit to the County's reliance on *In re Allred*, 351 N.C. 1, 519 S.E.2d 52 (1999) in arguing that Mr. Carter's appraisal should have correlated to the County's schedule of values.

In *In re Allred*, our Supreme Court addressed a taxpayer's challenge to a property tax valuation made pursuant to N.C.G.S. § 105-287, during a year in which a general reappraisal was not made. *Id.* at 10, 519 S.E.2d at 57. In a year in which a general reappraisal is

not made, "[a]n increase or decrease in the appraised value of real property authorized by this section *shall be made in accordance with the schedules, standards, and rules used in the county's most recent general reappraisal*," N.C. Gen. Stat. § 105-287 (2009) (emphasis added), and, therefore, the Court held the county "had a statutory obligation to use its adopted schedules of values in making any adjustments to the valuation of petitioners' property which were permissible under section 105-287" and the Commission erred by relying on an independent appraiser's collateral determination of the property's value that did not correlate with the schedule of values. *In re Allred*, 351 N.C. at 10-11, 519 S.E.2d at 57-58.

However, the taxpayer in this case did not appeal from a valuation during a year in which a general reappraisal was not made, but instead appealed from the County's general reappraisal of its property pursuant to N.C.G.S. § 105-286. In satisfying its burden of going forward with evidence tending to show the County's valuation was arbitrary or illegal and substantially exceeded the true value in money of the property, the taxpayer was entitled to offer evidence as to the true value of the property through the report of an independent appraiser.

The County also contends, "[s]ince the Commission did not accept [the taxpayer's] appraisal of market value, the Commission in effect determined that the [taxpayer] had not rebutted the presumption of the assessment's correctness on the second issue as to value." However, to rebut the presumption of correctness, the taxpayer must only offer evidence *tending to show* that the County's assessment substantially exceeded the true value in money of the property. *See In re IBM Credit Corp.*, 186 N.C. App. at 226-27, 650 S.E.2d at 830-31. Mr. Carter's appraisal, valuing the property at $7,735,000, was competent, material and substantial evidence tending to show that the County's assessment was substantially in excess of the true value in money of the property. The County's arguments on this issue are overruled.

[2] Next, the County argues that, assuming the taxpayer satisfied its burden of production, the County satisfied its burden of persuasion that its methods produced true value. The County contends the Commission "did not accept the [taxpayer's] appraisal showing a lower value," contends "the remaining evidence . . . as to valuation came from [the] County," and contends there is no evidence in the record supporting a capitalization rate of 10.5%.

"The critical determination at the final stage of the burden shifting analysis is whether the tax appraisal methodology adopted by the

tax appraiser is the proper 'means' or methodology given the charac-teristics of the property under appraisal to produce a 'true value' or 'fair market value.' " *In re IBM Credit Corp.*, ___ N.C. App. at ___, 689 S.E.2d at 491 (quoting N.C. Gen. Stat. § 105-283). The burden-shifting analysis "requires the trier of fact to test the validity of the appraisal premises underlying the appraisal method used." *Id.* It is " 'the Commission's duty to hear the evidence of both sides, to determine its weight and sufficiency and the credibility of witnesses, to draw inferences, and to appraise conflicting and circumstantial evidence, all in order to determine whether the [County] met its burden.' " *Id.* (quoting *In re S. Ry. Co.*, 313 N.C. at 182, 328 S.E.2d at 239). "Our Supreme Court has said valuations fixed by the Commission shall be final and conclusive where no error of law or abuse of discretion is alleged." *In re Winston-Salem Joint Venture*, 144 N.C. App. 706, 715, 551 S.E.2d 450, 456 (2001) (internal quotation marks omitted).

Aside from its general assertion that there "is no evidence of record that supports the Commission's use of a 10.5% capitalization rate," the County does not contend the Commission made an error of law or abused its discretion in valuing the property. Instead, the County lists the evidence it offered and describes why that evidence supports an assessment of $11,496,600. It contends that, because the "County showed that its appraisal did produce true value, the Property Tax Commission exceeded its authority in reducing the appraised value" of the property. These assertions fail to recognize that it is "the Commission's duty to hear the evidence of both sides, to determine its weight and sufficiency and the credibility of wit-nesses, to draw inferences, and to appraise conflicting and circum-stantial evidence, all in order to determine whether the [County] met its burden." *See In re S. Ry. Co.*, 313 N.C. at 182, 328 S.E.2d at 239. "The Commission has full authority, notwithstanding irregularities at the county level, to determine the valuation and enter it accordingly." *In re Winston-Salem Joint Venture*, 144 N.C. App. at 715, 551 S.E.2d at 556 (internal quotation marks omitted); *see also* N.C. Gen. Stat. § 105-290(3) (2009) ("On the basis of findings of fact and conclusions of law made after [a] hearing . . . [the] Commission shall enter an order (incorporating the findings and conclusions) reducing, increas-ing, or confirming the valuation or valuations appealed . . . .").

The Commission's decision demonstrates that it weighed the evi-dence and found that the income capitalization method should be used to determine the market value of the property, that the direct capitalization method was the most appropriate method, that an over-

all capitalization rate of 10.5% was most appropriate, and that, as of 1 January 2007, the value of the property was $9,461,476. The Commission therefore concluded the "County did not properly assess the subject property at its market value." The Commission had full authority to reduce the appraised value of the property and there is no merit to the County's suggestion to the contrary.

At this juncture, we consider the County's contention that no evidence supports the Commission's use of a 10.5% capitalization rate as well as the taxpayer's appeal, which similarly asserts the Commis-sion's use of a 10.5% capitalization rate is unsupported by the evidence and also, that the decision to use that rate was arbitrary or capricious.

After summarizing the process underlying Mr. Carter's estimated opinion of value, which divided the stabilized net operating income, excluding real estate taxes, of $993,455 by a tax-loaded overall capitalization rate of 12.842%, the Commission found that,

10. Of the sales information contained in his appraisal report, Mr. Carter relied upon the Mayberry Mall sale that occurred on December 28, 2007 to determine his overall capitalization rate of 12%. Mr. Carter made no adjustments to his overall capitalization rate due to the age of the Mayberry Mall property (The Mayberry Mall Property is fifty percent (50%) older than the subject property) and the sale of this property occurred after the January 1, 2007 reappraisal date.

. . . .

14. The direct capitalization method considers net operating income at only one point in time. As of January 1, 2007, the subject property's stabilized net operating income (NOI) excluding real estate taxes was $993,455. When considering all the evidence an overall capitalization rate of 10.5% is most appropriate to determine the market value of the subject property as of January 1, 2007. When the subject property's net operating income of $993,455 is divided by the overall capitalization rate of 10.5%, the total market value for the property subject to this appeal was $9,461,476 as of January 1, 2007; $201,900 for the retention pond parcel . . . and $9,259,576 for [the mall parcel].

(Footnotes omitted.)

In determining whether the Commission's decision is supported by competent, material and substantial evidence or arbitrary or capri-

cious, we review the whole record. *In re Weaver Inv. Co.*, 165 N.C. App. 198, 201, 598 S.E.2d 591, 593 (2004). The whole-record test is not a tool of judicial intrusion. *Id.* "We may not substitute our judgment for that of the Commission even when reasonably conflicting views of the evidence exist." *Id.* "It is the responsibility of the Commission to determine the weight and credibility of the evidence presented." *In re Owens*, 144 N.C. App. 349, 352, 547 S.E.2d 827, 829, *appeal dismissed and disc. review denied*, 354 N.C. 361, 556 S.E.2d 575-76 (2001). "The [Commission]—unlike the courts—has the staff, the specialized knowledge and experience necessary to make informed decisions upon questions relating to the valuation and assessment of property." *King v. Baldwin*, 276 N.C. 316, 324, 172 S.E.2d 12, 17 (1970).

Mr. Carter's report details that, to estimate a normal overall capitalization rate of 12% for the property, he reviewed data from a large number of sales of regional malls located in the southeastern region of the United States between 2004 and 2007, searching for malls that were "fairly similar to the subject in age, building size, market size, types of anchor tenants, and remaining lease terms of anchor tenants." He selected the four "most similar malls for inclusion as comparables in [his] analysis," which were all located in North Carolina: Mayberry Mall in Mount Airy, Boone Mall in Boone, Twin Rivers Mall in New Bern, and Parkwood Mall in Wilson. The overall capitalization rates from the sales of those malls are 12.01%, 8.94%, 17.34%, and 12.37%, respectively. Mr. Carter's report states that he "gave Mayberry Mall the most weight."

The Commission's decision explains Mr. Carter's appraisal method, relates his specific computation under the direct method of income capitalization, and finds that, citing relevant pages in Mr. Carter's report, the Mayberry Mall, the comparable most heavily relied upon by Mr. Carter in his estimation of an overall capitalization rate of 12%, was sold after the appraisal date of the property and was 50% older than the property and that Mr. Carter made no adjustment to his overall capitalization rate due to the age of the Mayberry Mall. Following that finding, consistent with Mr. Carter's opinion, the Commission found that use of the income capitalization approach was most appropriate to value the property, citing relevant pages in Mr. Carter's report, found that the direct capitalization method was most appropriate "because it is the method commonly used by investors in the region where the subject property is located," and found that, "after considering all the evidence," 10.5% was the most appropriate capitalization rate.

Thus, the Commission's decision demonstrates that, although it adopted Mr. Carter's appraisal method, it made a downward adjustment to the capitalization rate employed by Mr. Carter after recognizing that, in estimating that rate, Mr. Carter had relied most heavily on the sale of a mall which was 50% older than the Blue Ridge Mall and had been sold after the appraisal date of the property here. Because "[t]he capitalized value of a given income stream varies directly with the amount of income and inversely with the capitalization rate," *see In re Owens*, 132 N.C. App. 281, 287, 511 S.E.2d 319, 323 (1999), the Commission's downward adjustment to the capitalization rate was reasonable. We further note that the capitalization rates from sales of malls "most comparable" in Mr. Carter's report ranged from 8.94% to 17.34%; thus, the Commission's capitalization rate of 10.5% was within the range of those rates.

Although the taxpayer and the County disagree as to the proper capitalization rate to employ, we do not believe that a mere disagreement demonstrates the Commission's rate was unsupported by the evidence or was arbitrary or capricious. Given the Commission's duty to exercise judgment and discretion, *see In re AMP Inc.*, 287 N.C. at 561, 215 S.E.2d at 761, the Commission was free to use the method proposed by Mr. Carter and to adjust the capitalization rate Mr. Carter proposed based on its finding that Mr. Carter had relied on a mall 50% older than the Blue Ridge Mall which had been sold after the appraisal date of the property. *See Albemarle Elec. Membership Corp.*, 282 N.C. at 408, 192 S.E.2d at 815 ("[T]he determination of the [capitalization] rate is a matter of judgment. We find nothing in the record which indicates that the Board departed from the 'zone of reason' or acted arbitrarily in adopting the 6% capitalization rate."). Based on our review of the whole record, we hold that the Commission's use of a 10.5% capitalization rate is supported by the evidence and that the Commission's decision is not arbitrary or capricious. *See In re Senseney*, 95 N.C. App. 407, 413, 382 S.E.2d 765, 768 (1989) (rejecting the county's argument that "since no witness testified to the $6.50 per square value, the value is not based on competent, material and substantial evidence" where the Commission's findings were "essentially based on the report of the county's witness" and merely "corrected what [the Commission] perceived as errors in the calculations of square feet and inclusions in the comparables sales data"); *In re Appeal of Westinghouse Elec. Corp.*, 93 N.C. App. 710, 716, 379 S.E.2d 37, 40 (1989) (holding the Commission did not err by employing the depreciation method proposed by some experts, but increasing the depreciated value of improvements to the property

based on the testimony of other experts who did not use that method, because the Commission "was free to accept as much of [the experts'] testimony as it found convincing"); *see also In re Stroh Brewery Co.*, 116 N.C. App. 178, 188, 447 S.E.2d 803, 808 (1994) ("Although the Commission agreed with [the taxpayer's expert] that the property was affected by functional and economic obsolescence, it was not then bound to accept [the expert's] percentage for such obsolescence and could arrive at its own percentage so long as supported by competent, material and substantial evidence."). *But see In re Owens*, 132 N.C. App. at 289-90, 511 S.E.2d at 324-25 (holding that, where the Commission's decision failed to include the capitalization rate it used and where the record lacked evidence of comparable sales or a capitalization rate for the direct capitalization method employed by the Commission, the Commission's findings were unsupported by competent, material and substantial evidence).

**[3]** The County's final argument is that the Commission erred in its valuation of the 5.15-acre retention pond parcel bordering the south end of the Blue Ridge Mall, which adjoins the parcel owned by Belk. The Commission determined that the property's total market value was $9,461,476, valuing the retention pond parcel at $201,900 and the mall parcel at $9,259,576. The County argues the Commission erred by using "the mall's income" to value this parcel. The County contends the Commission should have valued this parcel based on its separate land value and not with the mall property by the income capitalization method. The County contends the separate valuation of these parcels is required by N.C.G.S. § 105-317, which requires the person making appraisals, "[i]n determining the true value of land, to consider as to each tract, parcel, or lot separately listed at least its advantages and disadvantages as to location . . . ." *See* N.C. Gen. Stat. § 105-317(a)(1). However, we note that the Commission assigned the 5.15-acre parcel the same value the County had assigned it—$201,900. Furthermore, the County does not appear to have argued before the Commission that the 5.15-acre parcel should not be appraised with the 24.19-acre parcel. Even assuming this particular issue was before the Commission, we note that Mr. Carter's appraisal report, which served as the basis for the Commission's use of the income capitalization method of valuing the property in determining its true value pursuant to N.C.G.S. § 105-283, considered and appraised the 5.15-acre parcel and the 24.19-acre parcel together. Mr. Carter's report states that the 5.15-acre parcel "contains the stormwater detention pond that serves the entire mall." His report states that the "Detention

Pond Parcel is very irregular and long, but its shape is suitable for its current use." His report notes that the building and parking areas on the mall parcel "have a level to very gently sloping topography" and that "[t]he developed area is drained by an underground stormwater system that collects stormwater through catch basins in the parking lot and drains it toward the detention pond." His appraisal was competent, material and substantial evidence that the County's method of appraisal was arbitrary or illegal and substantially exceeded the true value in money of the property.

Affirmed.

Judges ELMORE and GEER concur.