IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 19-927

Filed: 2 June 2020

North Carolina Property Tax Commission, No. 16 PTC 60
IN THE MATTER OF THE APPEAL OF: HARRIS TEETER, LLC, Appellant,

From the decision of the Mecklenburg County Board of Equalization and Review.

Appeal by taxpayer from Final Decision entered 30 May 2019 by the North Carolina Property Tax Commission. Heard in the Court of Appeals 30 April 2020.

*Bell, Davis & Pitt, P.A., by John Cocklereece, Justin Hardy and Kyle F. Heuser, for Appellant Taxpayer.*

*Ruff Bond Cobb Wade & Bethune, LLP, by Ronald L. Gibson and Robert S. Adden, Jr., for Appellee Mecklenburg County.*

ARROWOOD, Judge.

Harris Teeter, LLC ("taxpayer") and Mecklenburg County ("the County") both appeal from the Final Decision of the North Carolina Property Tax Commission ("the Commission") upholding the County's 2015 *ad valorem* property tax valuation of taxpayer's personal property. For the following reasons, we affirm.

I. <u>Background</u>

This case arises from the County's 2015 *ad valorem* tax assessment of taxpayer's business personal property, namely, the equipment in its grocery stores

within the county ("the property" or "the equipment"). In disagreement with the County's assessment, taxpayer filed several Notices of Appeal and Applications for Hearing to the North Carolina Property Tax Commission. On 6 February 2019, the County moved to dismiss taxpayer's appeal on the grounds that the signatory of taxpayer's notices of appeal was not a proper person to represent it before the Commission. The Commission denied the County's motion and heard the appeal on its merits at a hearing on 5 March 2019.

On appeal to the Commission, taxpayer and the County stipulated that they would present evidence regarding the equipment at six of taxpayer's stores in Mecklenburg County that were exemplary of various store models used by taxpayer, and the resulting valuations would be extrapolated to the rest of taxpayer's stores within the county.

Taxpayer's evidence before the Commission included the following. Mecklenburg County Assessor Kenneth Joyner, Jr., testified regarding the process by which he reached his valuation of the property. He testified that, using the replacement cost approach to determining true value, the County assessed taxpayer's property in these six locations at $21,434,313.00. Considering the value of each item of equipment as part of taxpayer's operations as a going concern, he took the original cost of the equipment as reported by taxpayer and went "into the cost index and [North Carolina Department of Revenue] depreciation schedules and identif[ied] the

proper categories to apply" to the property and "us[ed] the values that come out of the original cost and . . . appl[ied] those to the trending schedules within the software to arrive at value." He testified that he did not deviate from the values reached by application of the depreciation schedules by making any additional adjustments for other considerations. In relevant part, the Department of Revenue depreciation schedules noted that they "have been prepared . . . as a general guide to be used in the valuation of business personal property utilizing the replacement cost approach to value." They also noted that they "are only a guide" and "[t]here may be situations where the appraiser will need to make adjustments for additional or less functional or economic obsolescence or for other factors.

Taxpayer then presented the expert testimony of its own appraiser, Mitchell Rolnick ("Mr. Rolnick"). Mr. Rolnick conducted his own assessment using the replacement cost approach and appraised the property at $13,663,000.00. He testified that he applied his firm's preferred depreciation schedules to the original cost of each item of equipment and then adjusted the output values from the schedules based upon actual data he derived from market sales of comparable used equipment.

According to Mr. Rolnick, these market sales tended to show that used grocery store equipment equivalent in age and specifications to taxpayer's property sold for prices drastically below the County's appraised values. He testified that these low

market prices for used grocery store equipment necessitated downward adjustment of any values produced by depreciation schedules to reflect additional economic and functional obsolescence not captured by the schedules used by the County. He testified that these further adjustments resulted in appraisal values more in line with true value.

James Turner ("Mr. Turner") testified for the County regarding why such additional depreciation adjustments were inappropriate considerations in an application of the cost approach to taxpayer's property. He noted that, during 2015, the grocery industry was in a period of consolidation marked by increased store closures. These store closures caused a glut in the supply of used grocery store equipment that drove prices down, as grocers prefer to throw away their equipment or sell it in individual units on the open market rather than sell their fully installed and operative equipment to a competitor as a going concern. He further noted that taxpayer and other grocers in the industry only bought new equipment and did not deal in the used market.

Mr. Turner stated that transactions in the used market were thus more akin to forced sales reflecting liquidation values, rather than the true value of the equipment as fully functioning and installed into an integrated and operational grocery store. He therefore opined that adjusting depreciation to reflect the low prices fetched by individual units of grocery store equipment in the used market would not

produce true value, because used market transactions were not from a "willing seller" as mandated by N.C. Gen. Stat. § 105-283 (2019).

Mr. Turner testified that adjustment for depreciation additional to the rates incorporated into the depreciation schedules was inappropriate for the property. He noted that for most of taxpayer's equipment, he observed no economic or functional obsolescence that would necessitate any additional downward adjustment in value. However, he noted that he did adjust downward for certain classes of equipment quickly rendered obsolete by rapid technological advancements, such as electronic scanning equipment and computers. Furthermore, he accelerated depreciation on certain classes of equipment that taxpayer indicated it replaced on a more frequent basis than the timelines listed in the depreciation tables. Mr. Turner's independent appraisal methodology valued the property at $22,100,00.00.

Mr. Turner also questioned the validity of Mr. Rolnick's appraisal methodology on additional grounds. For example, he questioned Mr. Rolnick's failure to incorporate delivery and installation costs into observed market sales, which he said would overstate the depreciation of an item of equipment when compared against its original cost, which included such costs.

On 30 May 2019, the Commission rendered its Final Decision upholding the County's assessment of taxpayer's property. In its Final Decision, the Commission determined that taxpayer met its burden of producing evidence sufficient to shift the

burden to the County to prove that its assessment reflected true value. The Commission concluded that the County met its burden, based on the following findings of fact.

The Commission found no evidence of functional obsolescence affecting taxpayer's property, with some exceptions accounted for in Mr. Turner's appraisal. The Commission found that the equipment in taxpayer's stores does not become functionally obsolescent due to periodic renovations of each store. The Commission also "f[ou]nd no evidence in the record to suggest that the equipment in question (collectively) is failing to perform adequately the job for which it was intended due to design or economic factors."

Furthermore, the Commission found that economic obsolescence did not affect the property. The Commission found that both appraisal experts utilized the cost approach to appraise taxpayer's property because the sales comparison approach would not be viable without significant adjustment. Yet, Mr. Rolnick's methodology relied upon sales of used equipment without any adjustments to develop his schedules for calculating the level of depreciation applicable to the equipment. The Commission found it "illogical to determine that sales are too unreliable to be useful in developing value using the sales comparison approach, but then to use the same or similar sales, directly and without adjustment, under the cost approach to determine the

appropriate level of depreciation to apply to original installed cost in order to arrive at current, true value."

The Commission also found that the market prices for used grocery store equipment in the secondary market were an inappropriate consideration for economic obsolescence, based on the following finding:

> [W]e struggle to accept the argument that the market for new, installed equipment is the same as the market for used, uninstalled equipment that has been effectively discarded through store closures or even remodels. Clearly, the Appellant has chosen the new product over the old for a reason; if the used equipment were truly the equivalent of the new, there would be no rational reason to incur the removal and installation costs of a remodel. And, given that the options for used equipment disposal are either to trash it or sell it, it is reasonable to conclude that the marketplace for used equipment, even at the upper end of sales, is closer to a liquidation value for the equipment than to the true value of installed, adequately functioning equipment.

The Commission also found that, even if the secondary market provided relevant information for sales of equipment comparable to taxpayer's property, taxpayer's suggested appraisal methodology using such sales for downward adjustment of value was improper because it failed to consider delivery and installation costs not built into the prices fetched in the secondary market, thus inflating depreciation estimates derived from a comparison to original costs including delivery and installation.

Accordingly, the Commission found "that all or nearly all of the depreciation affecting the subject property is the result of physical deterioration . . . . As the parties [were] in substantial agreement that physical deterioration has been captured in the county's valuation of the assets," the Commission thus found that Mr. Turner's appraisal supported the County's valuation and was a reasonable estimate of true value.

## II.  Discussion

Taxpayer and the County both challenge the Commission's Final Decision on multiple grounds.  The County argues that the Commission erred by denying its motion to dismiss the appeal before it and improperly concluding that taxpayer put forth evidence at the hearing sufficient to shift the burden to the County to prove that its valuation produced true value.  Taxpayer argues that the Commission erred by making findings not supported by competent evidence, which in turn did not support its conclusion of law that the County satisfied its shifted burden.  Addressing each in turn, we are unpersuaded by these arguments and affirm the Commission's Final Decision.

### A.  Standard of Review

"Because the controlling issue in this case is whether the Commission properly accepted [the] County's method of valuing [taxpayer's property] rather than the method offered by taxpayer, we use the whole-record test to evaluate the conflicting

evidence." *In re Greens of Pine Glen Ltd.*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003); *see also* N.C. Gen. Stat. § 105-345.2(c) (2019).[1]

> The "whole record" test does not allow the reviewing court to replace the [Commission's] judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*. On the other hand, the "whole record" rule requires the court, in determining the substantiality of evidence supporting the [Commission's] decision, to take into account whatever in the record fairly detracts from the weight of the [Commission's] evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the [Commission's] result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.

*In re Parkdale Mills*, 225 N.C. App. 713, 716, 741 S.E.2d 416, 419 (2013) (alterations in original) (citation omitted). "The 'whole record' test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence." *In re McElwee*, 304 N.C. 68, 87, 283 S.E.2d 115, 127 (1981) (internal quotation marks and citation omitted).

### B.    Motion to Dismiss

---

[1] Although the dissent correctly notes that the Commission's conclusions of law receive *de novo* review, the ultimate determination that one of multiple competing appraisal methodologies produced true value is a finding of fact subject to review under the whole record standard. *In re Greens of Pine Glen*, 356 N.C. at 647, 576 S.E.2d at 319 (citation omitted).

As an initial matter, the County asserts that the Commission erred in denying its motion to dismiss taxpayer's appeal. The County argues that N.C. Gen. Stat. § 105-290(d2) (2019) precludes taxpayer from using an employee listed as its "director of financial support" from filing the Notice of Appeal and Application for Hearing from the County's tax assessment, because filing this form constitutes the practice of law and the employee was not one of the enumerated nonattorney representatives authorized by N.C. Gen. Stat. § 105-290(d2) to represent a corporation before the Commission. We hold that filing the notice of appeal form constitutes neither an "appearance" before the Commission nor the practice of law. Thus, we do not reach the issue of whether taxpayer's director of financial support was a person authorized to represent it before the Commission.

N.C. Gen. Stat. § 105-290(d2) provides the following restriction on who may represent a taxpayer in proceedings before the Commission:

> If a property owner is a business entity, the business entity may represent itself using a nonattorney representative who is one or more of the following of the business entity: (i) officer, (ii) manager or member-manager, if the business entity is a limited liability company, (iii) employee whose income is reported on IRS Form W-2, if the business entity authorizes the representation in writing, or (iv) owner of the business entity, if the business entity authorizes the representation in writing and if the owner's interest in the business entity is at least twenty-five percent (25%). Authority for and prior notice of nonattorney representation shall be made in writing, under penalty of perjury, to the Commission on a form provided by the Commission.

The County contends that filing the Notice of Appeal and Application for Hearing form with the Commission falls within the scope of this mandate, and therefore taxpayer's failure to provide notice of nonattorney representation for its financial director's filing of the form was a jurisdictional bar compelling dismissal of taxpayer's appeal. *See* 17 N.C.A.C. 11.0216(a) (2020) ("[Business entities] appearing before the Property Tax Commission . . . shall be represented by an attorney licensed to practice law in North Carolina, except as provided for in G.S. 105-290(d2). This requirement shall not be waived by the Commission. Notice of non-attorney representation pursuant to G.S. 105-290(d2) shall be filed with the Commission within 30 days of filing a Notice of Appeal or the appeal shall be subject to dismissal."). Unlike the dissent, we interpret this language as establishing a jurisdictional requirement for hearings before the Commission. Notice of nonattorney representation "*shall be made . . .* to the Commission on a form provided by the Commission." N.C. Gen. Stat. § 105-290(d2) (emphasis added). This notice "*shall be filed* with the Commission . . . or the appeal *shall be subject to dismissal.*" 17 N.C.A.C. 11.0216(a) (emphasis added). The dissent cites no law for its proposition that this requirement may be subject to waiver by the mere passage of time.

The dissent asserts that the act of filing the Notice of Appeal and Application for Hearing form constitutes the practice of law. Yet, the dissent believes that taxpayer's failure to provide notice of nonattorney representation therefor was cured

by attorney representation at a later stage in the proceedings. We cannot reconcile these positions.

We do not believe that filing the Notice of Appeal and Application for Hearing constitutes an appearance or legal representation requiring notice under N.C. Gen. Stat. § 105-290(d2). Nor does it violate the general purpose of North Carolina's prohibition on the corporate practice of law.

Nonattorney representation is the practice of law by someone unauthorized to do so in this State.

> The phrase "practice law" . . . is defined to be performing any legal service for any other person, firm or corporation, with or without compensation, specifically including . . . the preparation and filing of petitions for use in any court, including administrative tribunals and other judicial or quasi-judicial bodies, or assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation . . . .

N.C. Gen. Stat. § 84-2.1 (2019).

Though we have not yet had occasion to address the matter, our lower courts and courts in other jurisdictions have on previous occasions noted a "scrivener's exception" to this definition of practicing law. *See LegalZoom.com, Inc. v. North Carolina State Bar*, No. 11 CVS 1511, 2014 WL 1213242, at *12-14 (N.C. Super. Mar. 24, 2014) (recognizing applicability of scrivener's exception to some practices of *LegalZoom.com* in entering customer information into standard forms); *North Carolina State Bar v. Lienguard, Inc.*, No. 11 CVS 7288, 2014 WL 1365418, at *10-11

(N.C. Super. Apr. 4, 2014) (holding scrivener's exception inapplicable where entry of information into form required exercise of legal judgment); *Medlock v. LegalZoom.com, Inc.*, No. 2012-208067, 2013 S.C. LEXIS 362, at \*22-23, \*26-27 (Sup. Ct. S.C. 2013) (holding LegalZoom's preparation of legal forms by merely entering information provided by customer did not constitute practice of law); *see also Lola v. Skadden, Arps, Slate, Meagher & Flom, LLP*, 620 F. App'x 37, 44-45 (2d Cir. 2015) (holding no practice of law in document review if law firm's review protocol allowed attorney no exercise of judgment or discretion). In *LegalZoom.com, Inc. v. North Carolina State Bar*, the North Carolina Business Court described the scrivener's exception as one where "unlicensed individuals may record information that another provides without engaging in [the unauthorized practice of law] as long as they do not also provide advice or express legal judgments." 2014 WL 1213242 at \*12-13 (citing *In re Graham*, Nos. 02-81930C-7D, 02-82065C-7D, 2004 WL 1052963 (Bankr. M.D.N.C. Feb. 13, 2004) (recognizing scrivener's exception in federal bankruptcy court; holding exception inapplicable where defendant provided legal advice in addition to assistance in filling out forms), *aff'd*, Nos. 1:04CV0796, 1:04CV0797, 2005 WL 1719934 (M.D.N.C. Apr. 14, 2005); *In re Lazarus*, No. 05–80274C–7D, 2005 Bankr.LEXIS 1093, 2005 WL 1287634 (Bankr. M.D.N.C. Mar. 14, 2005)).

Although it did not expressly recognize the scrivener's exception, we find our reasoning in *Duke Power Co. v. Daniels* persuasive in the instant case. 86 N.C. App.

469, 358 S.E.2d 87 (1987). In *Duke Power Co.*, we held that a company employee did not engage in the unauthorized practice of law by filing a complaint on behalf of the company in small claims court. *Id.* at 471-72, 358 S.E.2d at 89. We reasoned that "we do not believe that a corporation that merely fills in and signs one of the simple complaint forms that the General Assembly itself devised, [N.C. Gen. Stat. §] 7A-232, and that our clerks of court regularly supply to prospective plaintiffs in small claims actions, is practicing law within the contemplation of [N.C. Gen. Stat. §] 84-5, the main purpose of which is to prohibit corporations from performing legal services for *others*. [Furthermore], even if such an innocuous act is deemed to technically violate the statute, it is not of such gravity, in our opinion, as to deprive the court of jurisdiction and justify the dismissal of plaintiff's action." *Id.* at 472, 358 S.E.2d at 89 (emphasis in original).

The procedures established by our legislature for actions in small claims court are different than those for an administrative appeal before the Commission. Nonetheless, we find this reasoning persuasive. Here, the Notice of Appeal and Application for Hearing form requires a mere handful of blanks to be filled in by the petitioner relating to the name and contact information of the appellant, the address of the property subject to the appeal, and the date of the decision appealed from. Moreover, the director of financial support filed the form on behalf of taxpayer as his employing corporation, rather than for another person or entity. Thus, our concern

for protecting others from the corporate practice of law on their behalf is also inapplicable.

We do not find the dissent's reliance on *State v. Cash*, __ N.C. App. __, __ S.E.2d __, 2020 WL 1264007 (N.C. Ct. App. Mar. 17, 2020), persuasive or pertinent to the facts of the instant case. In *Cash*, this Court held that the preparation and filing of a motion to set aside bail bond forfeiture pursuant to N.C. Gen. Stat. § 15A-544.5 (2019) constituted the practice of law. *Id.* at __, __ S.E.2d at __, 2020 WL 1264007 at *3. This statute enumerates seven specific factual scenarios in which a bond forfeiture may be set aside upon motion. N.C. Gen. Stat. § 15A-544.5(b)(1)-(7). Drafting such a motion requires the exercise of legal judgment to determine if any of the seven specified circumstances apply to the situation then before the court. Thus, the filing of a motion to set aside bond forfeiture falls outside the scrivener's exception articulated by our lower courts and is distinguishable from the facts before us in *Duke Power Co.*

Without opining on the full extent of its potential scope, we find the scrivener's exception to the practice of law applicable in the instant case. Taxpayer's director of financial support filled out a handful of blanks on a standardized, fill-in-the-blank appeal form and filed it with the Commission. The information he furnished on the form included no more than the basic details about the property tax assessment from which taxpayer sought appeal. Filling in these basic details into a standard form

required no exercise of legal judgment. Moreover, taxpayer was represented by a licensed attorney at the hearing before the Commission. Therefore, we do not believe that taxpayer availed itself of nonattorney representation before the Commission requiring notice under N.C. Gen. Stat. § 105-290(d2). The Commission did not err in denying the County's motion to dismiss.

### C.  Substantive Challenges to Final Decision

Taxpayer and the County both argue that the Commission erred in its application of the evidentiary standard applicable to challenges of *ad valorem* tax assessments. We disagree on both accounts.

"[A]d valorem tax assessments are presumed to be correct." *In re AMP, Inc.*, 287 N.C. 547, 562, 215 S.E.2d 752, 761 (1975).

> Of course, the presumption is only one of fact and is therefore rebuttable. But, in order for the taxpayer to rebut the presumption he must produce 'competent, material and substantial' evidence that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of valuation; AND (3) the assessment *substantially* exceeded the true value in money of the property. Simply stated, it is not enough for the taxpayer to show that the means adopted by the tax supervisor were wrong, he must also show that the result arrived at is *substantially* greater than the true value in money of the property assessed, i.e., that the valuation was *unreasonably* high.

*Id.* at 563, 215 S.E.2d at 762 (emphasis in original) (internal citations omitted). A property valuation methodology is arbitrary and illegal if it fails to produce "true

value" as defined in N.C. Gen. Stat. § 105-283 (2019). *In re Blue Ridge Mall, LLC*, 214 N.C. App. 263, 269, 713 S.E.2d 779, 784 (2011) (citation omitted).

> All property, real and personal, shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the words "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

N.C. Gen. Stat. § 105-283. "In attempting to rebut the presumption of correctness, the burden upon the aggrieved taxpayer is one of production and not persuasion." *In re Blue Ridge Mall, LLC*, 214 N.C. App. at 267, 713 S.E.2d at 782 (internal quotation marks and citation omitted). "[If] the taxpayer rebuts the initial presumption, the burden shifts back to the County which must then demonstrate that its methods produce true values." *In re Parkdale Mills*, 225 N.C. App. at 717, 741 S.E.2d at 420 (citation omitted).

### 1.    Taxpayer Rebutted Presumption of Validity

The County argues that the Commission erred in its Final Decision by concluding that taxpayer had rebutted the presumption of validity for the County's valuation of its personal property. We disagree.

Taxpayer presented expert testimony from Mr. Rolnick, an appraiser of business personal property. Mr. Rolnick conducted his own valuation of taxpayer's

personal property, which was reduced to an extensive report submitted into evidence at the hearing. This report and Mr. Rolnick's testimony tended to show that a proper valuation for the property under the cost approach to property appraisal was $13,663,000.00, $7,771,313.00 lower than the County's valuation of $21,434,313.00. Mr. Rolnick testified that this discrepancy was due to his adjustment for economic and functional obsolescence in taxpayer's equipment, derived from research into comparable market transactions. He stated that the County's failure to account for additional observed depreciation after inputting the property's original cost into the depreciation schedules resulted in a valuation that did not reflect true value.

Therefore, competent evidence supported the Commission's determination that taxpayer met its burden to produce evidence that the County's appraisal methodology did not produce true value, and shifted the evidentiary burden to the County to show otherwise. Assuming *arguendo* that taxpayer's evidence was insufficient to shift the evidentiary burden to the County, it was not prejudiced thereby. The Commission ultimately concluded that the County met its shifted burden by showing why its application of the cost approach resulted in an appraisal reflecting true value. *See* N.C. Gen. Stat. § 105-345.2(c) (applying rule of prejudicial error to Commission's decisions).

2.    <u>The County's Evidence Met Its Shifted Burden</u>

Taxpayer argues that the Commission erred in its Final Decision by making findings unsupported by competent evidence and concluding as a matter of law that the County put forth evidence sufficient to meet its shifted burden to prove that its appraisal methodology produced true value. We disagree.

Once a taxpayer has rebutted the presumption of validity and the county puts forth evidence supporting its appraisal as reflective of the true value of the subject property,

> [t]he critical inquiry . . . [becomes] whether the County's appraisal methodology is the proper means or methodology given the characteristics of the property under appraisal to produce a true value or fair market value. To determine the appropriate appraisal methodology under the given circumstances, the Commission must hear the evidence of both sides, to determine its weight and sufficiency and the credibility of witnesses, to draw inferences, and to appraise conflicting and circumstantial evidence, all in order to determine whether the [County] met its burden.

*In re Parkdale Mills*, 225 N.C. App. at 717, 741 S.E.2d at 420 (internal quotation marks and citation omitted).

In the instant case, both taxpayer and the County agree generally that the cost approach was the appropriate appraisal methodology for taxpayer's personal property. "The cost approach commonly measures value by estimating the current cost of a new asset, then deducting for various elements of depreciation, including physical deterioration and functional and external obsolescence to arrive at 'depreciated cost new.' The 'cost' may be either reproduction or replacement costs.

The logic behind this method is that an indication of value of the asset is its cost (reproduction or replacement) less a charge against various forms of obsolescence such as functional, technological and economic as well as physical deterioration if any." *In re IBM Credit Corp.*, 201 N.C. App. 343, 351, 689 S.E.2d 487, 493 (2009)

Furthermore, the parties agree that widely accepted depreciation schedules used in the appraisal profession should be applied to determine the degree to which the property's current value has decreased since taxpayer bore the original costs of acquiring it and putting it to use. However, the parties disagree concerning the degree to which functional and economic obsolescence should be considered and used to further adjust appraisal values for additional depreciation after application of depreciation schedules.

> Part of the cost approach is deducting for depreciation, which is a loss of utility and, hence, value from any cause . . . [representing] the difference between cost new on the date of appraisal and present market value. Depreciation may be caused by deterioration, which is a physical impairment, such as structural defects, or by obsolescence, which is an impairment of desirability or usefulness brought about by changes in design standards (*functional obsolescence*) or factors external to the property (*economic obsolescence*).

*In re Appeal of Stroh Brewery*, 116 N.C. App. 178, 186, 447 S.E.2d 803, 807 (1994) (ellipses and emphasis in original) (internal quotation marks and citations omitted).

The crux of taxpayer's argument on appeal is that the Commission erred by finding as fact that functional and economic obsolescence did not affect its property,

and were therefore inappropriate to apply in any downward adjustment of the values reached from application of the depreciation schedules. Accordingly, taxpayer argues that the Commission's failure to recognize the need for downward adjustment of values produced by the depreciation schedules is fatal to its conclusion of law that the County's assessment did not reflect true value of taxpayer's property. We are not convinced. The Final Decision's findings of fact, discussed *infra*, are supported by competent evidence, adequately explain why additional downward adjustment of values to reflect functional and economic obsolescence was inappropriate, and support the Commission's conclusion of law that the County met its shifted burden to show that its appraisal produced true value.

a.  Functional Obsolescence

We have previously defined functional obsolescence as "a loss in value due to impairment of functional capacity inherent in the property itself" including factors such as "overcapacity, inadequacy or changes in state of the art, or poor design." *In re Westmoreland-LG&E Partners*, 174 N.C. App. 692, 699, 622 S.E.2d 124, 130 (2005) (internal quotation marks, alterations, and citations omitted).

In its Final Decision, the Commission found no evidence of functional obsolescence affecting taxpayer's property, with the exception of computers and other electronic equipment, for which Mr. Turner's appraisal methodology accounted by downwardly adjusting the value produced by the depreciation schedules. The

Commission also found that the equipment in taxpayer's stores does not become functionally obsolescent due to periodic renovations of each store, during which most equipment has a routine replacement schedule of approximately six years. Moreover, the Commission "f[ou]nd no evidence in the record to suggest that the equipment in question (collectively) is failing to perform adequately the job for which it was intended due to design or economic factors." Taxpayer does not dispute these findings, and they are therefore binding on appeal.

The Commission also considered functional obsolescence in the following finding:

> Mr. Turner testified that he identified additional functional obsolescence in computer-based equipment and further depreciated the value of those assets in order to account for the additional loss in value. He testified that he accelerated the depreciation on certain types of equipment as a result of information he received from the Appellant's staff—that some equipment was replaced before the end of its normal useful life because of severe use of that equipment. . . . Mr. Turner testified further that he had personally developed income-based values in order to determine for himself whether the subject property was producing an appropriate return for the Appellant, and determined that the subject property produced income greater than standard for the industry. His conclusion, therefore, is that the subject property does not exhibit economic obsolescence, and we agree. The property's apparent capacity to generate income greater than the industry standard is not an indication of economic obsolescence.

Although this finding mistakenly refers to economic obsolescence in two instances, it is clear from a reading of the finding as a whole that it speaks to indicators of functional obsolescence. Taxpayer argues that this finding was in error because the Commission's consideration of the returns on its equipment compared to industry norms illegally weighted its subjective value to taxpayer over true value as defined in N.C. Gen. Stat. § 105-283. It further argues that its comparative performance against competitors in the industry is irrelevant to the true value of its property.

Taxpayer's argument conflates its own subjective value of its equipment with aspects of the equipment's relative performance, which are properly considered indicators of functional obsolescence. In *In re Westmoreland*, we approved of the Commission's finding of no functional obsolescence in a power company's plants where "[t]he record indicate[d] both plants ha[d] outstanding performance records, operate[d] above industry standards in production, ha[d] no environmental problems, and ha[d] been consistently profitable." 174 N.C. App. at 699-700, 622 S.E.2d at 130. Here, the Commission gave weight to evidence tending to show that taxpayer's equipment performed well compared to that of the industry as a whole, an

appropriate indication that functional obsolescence did not affect the equipment. Therefore, the Commission did not err in this finding.[2]

### b. Economic Obsolescence

Taxpayer next argues that the Commission should have given weight to the market for used grocery store equipment in evaluating whether the County's appraisal values required additional downward adjustment for economic obsolescence, and its failure to do so resulted in an erroneously negative finding on that issue.  We are not convinced.  The Commission's findings were supported by competent evidence and adequately address why consideration of the market for used grocery store equipment was inappropriate and did not warrant additional downward adjustment of the depreciation schedule values.

The Commission found that taxpayer's expert Mr. Rolnick utilized the cost approach to appraise taxpayer's property because the sales comparison approach would not be viable without significant adjustment.  Yet, Mr. Rolnick relied upon sales of used equipment without any adjustments to develop his schedules for calculating the level of depreciation applicable to the equipment.  The Commission

---

[2] The dissent makes much of the fact that Mr. Turner's appraisal methodology adjusted values in several specific classes of equipment for observed functional obsolescence unique to those classes of equipment.  It argues that this fact renders Mr. Turner's appraisal unsupportive of the County's appraisal methodology, which failed to account for these specific instances of functional obsolescence. Yet the dissent forgets that it is not enough for a taxpayer to prove that the county used an arbitrary or illegal appraisal methodology.  A challenge to an *ad valorem* property tax valuation will fail in spite of an arbitrary and illegal appraisal methodology where the evidence before the Commission shows that this methodology nonetheless produced values that did not substantially exceed true value.  *In re AMP*, 287 N.C. at 563, 215 S.E.2d at 762 (citation omitted).

found it "illogical [for Mr. Rolnick] to determine that sales are too unreliable to be useful in developing value using the sales comparison approach, but then to use the same or similar sales, directly and without adjustment, under the cost approach to determine the appropriate level of depreciation to apply to original installed cost in order to arrive at current, true value."

The Commission also found that the market prices for used grocery store equipment in the secondary market were an inappropriate consideration in part based upon the following finding:

> [W]e struggle to accept the argument that the market for new, installed equipment is the same as the market for used, uninstalled equipment that has been effectively discarded through store closures or even remodels. Clearly, the Appellant has chosen the new product over the old for a reason; if the used equipment were truly the equivalent of the new, there would be no rational reason to incur the removal and installation costs of a remodel. And, given that the options for used equipment disposal are either to trash it or sell it, it is reasonable to conclude that the marketplace for used equipment, even at the upper end of sales, is closer to a liquidation value for the equipment than to the true value of installed, adequately functioning equipment.

Taxpayer argues that "[t]he Commission committed a critical error in finding as a fact that the market for used grocery store equipment was inadequate for the purpose of identifying obsolescence affecting the Property, seemingly under the mistaken belief the Property is new equipment rather than used equipment[.]" We disagree. Read as a whole, this finding's use of the word "new" is clearly in reference

to "installed, adequately functioning equipment," as opposed to the older equipment taxpayer phases out of its stores during periodic remodels.

In any event, taxpayer argues that the Commission erred by failing to find as fact that the value of its property is negatively influenced by economic obsolescence. We disagree. Implicit in the Commission's finding is its determination that, due to the prevailing industry trend of store closures flooding the supply in the secondary market for used equipment, the prices fetched by such sales do not represent transactions from "willing sellers" of the equipment as mandated by N.C. Gen. Stat. § 105-283.

"Implicit in the language and in our interpretation of [N.C. Gen. Stat. § 105-283] is the on-going entity assumption." *In re AMP*, 287 N.C. at 570, 215 S.E.2d at 766. In *In re AMP*, the taxpayer electronics manufacturer argued that its unfinished inventory and raw materials could only be sold on the scrap metal market, and therefore the county's valuation of these classes of property above scrap prices exceeded true value. *Id.* at 567-68, 215 S.E.2d at 765. We disagreed, noting that "AMP's desired interpretation of [N.C. Gen. Stat. §] 105-294 (now [N.C. Gen. Stat. §] 105-283) is based on the assumption, obviously fictional, that on 1 January of each year it is required to sell all of its inventory, whether such inventory is in raw material or in an in-process state, to the only possible buyers of such materials, the scrap mills." *Id.* at 568, 215 S.E.2d at 765. We further opined that "[i]t [was]

ludicrous to assert that ... the undamaged raw materials, which constituted approximately 82% of all the taxable property on hand [during the years in question], lost approximately sixty percent of its value upon being transferred from the delivery truck into AMP's warehouse facilities. . . . Such a contention defies all logic and common sense." *Id.* at 574, 215 S.E.2d at 769. Furthermore, we noted that the evidence showed that the taxpayer in fact never sold unfinished inventory to scrap metal purchasers. *Id.* at 570, 215 S.E.2d at 766.

Similarly, in the instant case taxpayer would have the Commission valuate its property as if it were not integrated into its business as a going concern. Taxpayer's suggested valuation assumes that each piece of equipment is due for replacement and headed to either the landfill or the glutted secondary market at the moment it is valuated. Likewise, taxpayer's approach would result in its equipment experiencing a drastic reduction in value the moment they are purchased new and installed in its stores. Furthermore, the evidence showed that taxpayer and its industry counterparts in fact did not deal in the secondary market for grocery store equipment when buying equipment or disposing of equipment scheduled for replacement.

At any rate, the Commission also found that even if the secondary market provided relevant information for sales of equipment comparable to taxpayer's property, taxpayer's suggested appraisal methodology using such sales for downward

adjustment of value was improper because it failed to consider delivery and installation costs not built into the prices fetched in the secondary market:

> The record discloses extensive evidence that the depreciation schedules developed for the Appellant's opinion of value were not based upon sales that included the installed cost of putting the sold equipment to use. The Appellant's stated position is that, because the original installed cost includes the costs required to deliver, install, and put the original equipment to its intended use, adding those same costs to the sale prices of the sold equipment would essentially double-count installation costs and therefore overstate the sale prices and underestimate depreciation. We disagree. If the basis for determining true value under the cost approach is the total cost required to put equipment to its intended use, then a resale of used equipment must also include installation and other necessary costs in order for that sale to be useful in isolating any depreciation element. Otherwise, any difference between the installed cost of new equipment and the uninstalled cost of used equipment would reflect both depreciation and installation cost, because the used equipment in the hands of a buyer cannot be put to its intended use until it is delivered and installed.

Taxpayer argues that this finding is erroneous because "[f]air market value is the price paid by a willing buyer to a willing seller for property. N.C. Gen. Stat. § 105-283. Money paid by a hypothetical buyer to a third party for services related to acquired property is not money paid to a willing seller. By definition, including such monies would violate North Carolina's fair market value standard."

The Commission heard competent testimony supporting its assessment. Mr. Turner testified that delivery and installation costs were particularly significant for

individual pieces of used grocery store equipment that function as parts of a larger integrated system. For example, a single segment of refrigerator casing in a supermarket's frozen foods section, when bought individually on the used market, would later have to be integrated with the other refrigerator casings on the aisle and connected to the refrigeration unit serving them. Thus, the mere market price of a used refrigerator casing reflected only a portion of total replacement cost. Mr. Turner testified that adding delivery and installation costs to sales price for new equipment to reach the original cost to taxpayer, while failing to do so for sales prices of used equipment, would result in an inflated discrepancy in value that overstated economic obsolescence.

Mr. Turner's appraisal of the property produced a value slightly higher than the County's assessment. The record supports the Commission's reliance on this appraisal. The Commission heard competent testimony supporting its findings that secondary market sales of used grocery store equipment were inappropriate for consideration in downward adjustment the appraisal value of taxpayer's equipment, and that Mr. Rolnick's appraisal methodology did not adequately factor delivery and installation costs into such sales in any event, thus inflating depreciation due to economic obsolescence. Competent evidence also supported the Commission's findings that functional obsolescence did not affect the property. Accordingly, we

uphold the Commission's legal determination that the County met its shifted burden to prove that its assessment did not substantially exceed true value of the property.

### III.    Conclusion

For the foregoing reasons, we affirm the Commission's Final Decision.

AFFIRMED.

Judge BRYANT concurs.

Judge TYSON concurs in the result in part and dissents in part.

No. COA19-927 – *In re: Harris Teeter, LLC*

TYSON, Judge, concurring in the result in part and dissenting in part.

## I. Introduction

The County failed to either object or move to dismiss this appeal for almost three years. The County has waived any objection to the nonjurisdictional signature requirement in their motion to dismiss. It is unnecessary to articulate a scrivener's exception to our common law, statutes, or precedents. I concur in the result only with this section of the majority's opinion.

I also concur with the majority opinion's conclusion that the record shows competent evidence supports the PTC's determination that Taxpayer had met its burden to produce evidence tending to show the County's appraisal methodology did not produce or establish market value. Taxpayer's showing shifted the evidentiary burden to the County to rebut this evidence.

I respectfully dissent from the majority opinion's conclusion that the County rebutted the Taxpayer's showing that the County had used an arbitrary and illegal method of appraisal to value and assess Taxpayer's personal property at market value. *See In re AMP, Inc.*, 287 N.C. 547, 563, 215 S.E.2d 752, 762 (1975).

## II. County's Motion to Dismiss

Before the Property Tax Commission ("PTC"), Harris Teeter ("Taxpayer") argued the County had waited over three years to file the motion to dismiss. Any issue with Taxpayer's form AV-14 filed with the PTC was not jurisdictional under N.C. Gen. Stat. § 105-290(d2) (2019) and was cured by counsel's notice of appearance,

also filed with the PTC. The County waived any challenge to the form AV-14 by failing to object and by filing the motion to dismiss three years later after the alleged defect had been cured. *See Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 198, 657 S.E.2d 361, 365 (2008) ("a party's failure to comply with nonjurisdictional rule requirements normally should not lead to dismissal of the appeal").

The majority's opinion employs an improper analysis to reach their conclusion. N.C. Gen. Stat. § 84-5 governs the "practice of law by corporation[s]" and states, in relevant part: "It shall be unlawful for any corporation to practice law or appear as an attorney for any person in any court in this State . . . and no corporation shall . . . draw agreements, or other legal documents." N.C. Gen. Stat. § 84-5 (2019).

Under the Administrative Code, 17 N.C. Admin. Code 11.0216(a) provides the bright line rule for practice before the PTC. "Parties appearing before the Property Tax Commission may either represent themselves if natural persons, or shall be represented by an attorney licensed to practice law in North Carolina, except as provided for in G.S. 105-290(d2)." 17 N.C. Admin. Code 11.0216(a) (2020). "This requirement shall not be waived by the Commission." *Id.* Taxpayer did not comply with this rule. Any defect was cured by the notice of appearance and representation by licensed counsel in preparation for the hearing, in filings before the PTC, and at the hearing. The text of N.C. Gen. Stat. § 105-290(d2) provides a limited exception

2

*Tyson, J., concurring in the result in part and dissenting in part.*

for individuals involved in a corporation to appear, that is not applicable to this filing. N.C. Gen. Stat. § 105-290(d2) ("If a property owner is a business entity, the business entity may represent itself using a nonattorney representative who is one or more of the following of the business entity: (i) officer, (ii) manager or member-manager, if the business entity is a limited liability company, (iii) employee whose income is reported on IRS Form W-2, if the business entity authorizes the representation in writing, or (iv) owner of the business entity, if the business entity authorizes the representation in writing and if the owner's interest in the business entity is at least twenty-five percent (25%). Authority for and prior notice of nonattorney representation shall be made in writing, under penalty of perjury, to the Commission on a form provided by the Commission.").

By asserting the Taxpayer's unlicensed employee's signature on the form AV-14 was neither a practice of law nor an appearance, the majority's opinion disregards N.C. Gen. Stat. §§ 84-5, 105-290(d2), and 17 N.C. Admin. Code 11.0216(a), and fails to properly reconcile or follow this Court's recent opinion in *State v. Cash*, __ N.C. App. __, __, __ S.E.2d __, __, 2020 WL 1264007 at *3 (holding "a corporation is prohibited from practicing law, and because 'a corporation must be represented by a duly admitted and licensed attorney-at-law and cannot proceed *pro se*" (citation omitted)).

3

*Tyson, J., concurring in the result in part and dissenting in part.*

The majority attempts to distinguish *Cash* with reliance upon *Duke Power Co. v. Daniels*, 86 N.C. App. 469, 358 S.E.2d 87 (1987). *Duke Power Co.* only analyzes N.C. Gen. Stat. § 84-5, and not a PTC rule of practice or the Administrative Code. *Id.* at 471-72, 358 S.E.2d at 89. Their opinion also overextends the narrow application of *Duke Power Co.* to the relaxed pleading, procedural, and practice requirements in small claims court before the magistrate to the PTC's and other agencies' and commissions' rules of practice. 17 N.C. Admin. Code 11.0216(a).

The County's failure to assert its motion to dismiss for three years, and after a notice of appearance of counsel had been filed, waived any objection to Taxpayer's otherwise timely and proper AV-14. *Dogwood*, 362 N.C. at 198, 657 S.E.2d at 365.

### III. True Value of Money

The PTC is "the trial court of record" for appeals of decisions from county boards of equalization and review. N.C. Gen. Stat. § 105-290 (2019). Even under the "whole record test", this Court reviews the PTC's conclusions of law *de novo*. *In re Appeal of Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 646-47, 576 S.E.2d 316, 319 (2003). The ultimate determination of "true value in money" and "market value" under the statute is a conclusion of law. *Id.* ("Questions of law receive *de novo* review, while issues such as sufficiency of the evidence to support the Commission's decision are reviewed under the whole-record test.").

*Tyson, J., concurring in the result in part and dissenting in part.*

Unlike the majority's assertion, this case is not simply a determination of a method of valuation, which is not disputed, but a review of the Commission's conclusion of the "true value in money" of Taxpayer's personal property. *See Id.* "[A]ny determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law." *Barnette v. Lowe's Home Ctrs., Inc.*, 247 N.C. App. 1, 6, 785 S.E.2d 161, 165 (2016) (citation omitted).

A finding of fact is a "determination reached through logical reasoning from the evidentiary facts." *Id.* The calculation of the "true value of money," involves the application of statutory legal principles, which is a conclusion of law and not a finding of fact. *See id.*

The standard the PTC must apply to determine and conclude the "true value in money" to assess a taxpayer's property is statutorily established by the General Assembly:

> All property, real and personal, shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the words "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

N.C. Gen. Stat. § 105-283 (2019).

*Tyson, J., concurring in the result in part and dissenting in part.*

This Court has held that a property valuation methodology utilized by the county, which fails to produce a "true value in money" as is defined in N.C. Gen. Stat. § 105-283, is both arbitrary and illegal. *In re Appeal of Lane Co.*, 153 N.C. App. 119, 124, 571 S.E.2d 224, 227 (2002).

The statutory definition requires the "'true value in money' shall be interpreted as meaning market value." N.C. Gen. Stat. § 105-283. This definition is both well-known and widely used beyond the context of assessing the value of real and personal property for *ad valorum* taxation. It is the same definition of market value used by the federal government and the Appraisal Institute. Treas. Reg. § 20.2031-1(b) (as amended in 1965) ("The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."); s*ee also Fair Market Value,* Dictionary of Real Estate Appraisal p. 141 (6th Ed. 2015).

The Supreme Court of the United States has held:

> The market value of . . . property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . , piece of property.

*Tyson, J., concurring in the result in part and dissenting in part.*

*BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537-38, 128 L. Ed. 2d 556, 564 (1994) (citations omitted).

As such, it is the objective "market value" or "true value in money," and not an unadjusted agency-prepared "one size fits all" schedule of values or undifferentiated mass appraisal, that controls and determines the taxable value of real or personal property subject to assessment. *See* N.C. Gen. Stat. § 105-283.

The North Carolina Department of Revenue clearly recognizes the market-based "true value in money" mandate of the statute. The transcript shows the Department of Revenue's business personal property schedules clearly caution they "have been prepared . . . as *a general guide* to be used in the valuation of business personal property utilizing the replacement cost approach to value." (Emphasis supplied). Since they "are only a guide," the assessor is admonished; "[t]here may be situations where the appraiser will need to make adjustments for additional or less functional or economic obsolescence or for other factors."

This directive, requiring the assessor using the schedule of values and applying depreciation "to make adjustments for additional or less functional or economic obsolescence or for other factors," is also required by precedents. "Depreciation may be caused by deterioration, which is a physical impairment, such as structural defects, or by obsolescence, which is an impairment of desirability or usefulness brought about by changes in design standards (*functional obsolescence*) or factors

7

*Tyson, J., concurring in the result in part and dissenting in part.*

external to the property (*economic obsolescence*)." *In re Appeal of Stroh Brewery*, 116 N.C. App. 178, 186, 447 S.E.2d 803, 807 (1994) (emphasis original) (internal quotation marks and citations omitted).

The Taxpayer, County, and PTC agree the cost approach is the appropriate appraisal methodology for valuing Taxpayer's personal property. The parties also agree that widely accepted depreciation schedules used in the appraisal profession and tax assessors should be applied in a manner to determine the degree to which the property's current value has decreased since the Taxpayer's acquisition cost.

> The cost approach commonly measures value by estimating the current cost of a new asset, then deducting for various elements of depreciation, including physical deterioration and functional and external obsolescence to arrive at "depreciated cost new." The "cost" may be either reproduction or replacement costs. The logic behind this method is that an indication of value of the asset is its cost (reproduction or replacement) less a charge against various forms of obsolescence such as functional, technological and economic as well as physical deterioration if any.

*In re Appeal of IBM Credit Corp.*, 201 N.C. App. 343, 351, 689 S.E.2d 487, 493 (2009).

The parties disagree about the degree of adjustments for functional and economic obsolescence to be applied to further adjust the scheduled values to allow for additional depreciation, after application of the depreciation schedules. The crux of the issue before the PTC and on appeal is the proper application of "an impairment of desirability or usefulness brought about by changes in design standards (*functional obsolescence*) or factors external to the property (*economic obsolescence*)" to arrive at

8

*Tyson, J., concurring in the result in part and dissenting in part.*

the statutorily required mandate of determining "true value in money" prior to assessment. *Stroh Brewery*, 116 N.C. App. at 186, 447 S.E.2d at 807.

The improper determination of "true value in money," *i.e.*, "market value" is unlawful as an "arbitrary or illegal" method of appraisal, but the taxpayer's evidence "must also show that the result arrived at is *substantially* greater than the true value in money of the property assessed, i.e., that the valuation was *unreasonably* high." *AMP*, 287 N.C. at 563, 215 S.E.2d at 762 (emphasis original).

That second element the taxpayer is required to show is uncontested here. Assessor Kenneth Joyner, Jr. testified the County used the replacement cost approach and assessed Taxpayer's property in the six locations at bar at $21,434,313.00. Mitchell Rolnick, MAI, Taxpayer's expert witness and appraiser, used the replacement cost approach and appraised the property at $13,663,000.00, or $7,771,313.00 lower than the County's valuation. The majority's opinion baldly asserts this uncontested difference of the parties' evidence of values produced is not "*substantially* greater than the true value in money of the property assessed." *Id.* At the six representative stores the difference in values presented was $7,771,313.00, a difference of over 50% of Taxpayer's asserted value. This difference by itself "substantially exceeds true value" and, when compounded across all of Taxpayer's locations within the County "substantially exceeds true value."

IN RE: HARRIS TEETER, LLC

*Tyson, J., concurring in the result in part and dissenting in part.*

We all agree: (1) the record shows competent evidence supported the PTC's determination that Taxpayer met its burden to produce evidence tending to show the County's appraisal methodology did not produce market value; and, (2) that showing shifted the evidentiary burden to the County to show otherwise. *See In re Appeal of Parkdale Mills*, 225 N.C. App. 713, 717, 741 S.E.2d 416, 420 (2013) ("once the taxpayer rebuts the initial presumption, the burden shifts back to the County which must then demonstrate that its methods produce true values"); *see also* N.C. Gen. Stat. § 105-283.

The Commission properly concluded Taxpayer met its burden to produce evidence showing the County's appraisal methodology did not produce "true value in money," which shifted the evidentiary burden of persuasion to the County to show otherwise. N.C. Gen. Stat. § 105-283. *See In re Blue Ridge Mall*, 214 N.C. App. at 267, 713 S.E.2d at 782 ("In attempting to rebut the presumption of correctness, the burden upon the aggrieved taxpayer is one of production and not persuasion." (quotation marks and citation omitted)). Nothing else appearing, Taxpayer's appeal would be upheld, and a decision entered in its favor.

The County called Appraiser James Turner in an attempt to rebut Taxpayer's evidence that additional depreciation adjustments were needed and appropriate to apply to the cost approach to Taxpayer's personal property. Mr. Turner candidly acknowledged he agreed with Taxpayer and had also adjusted initial values from the

10

*Tyson, J., concurring in the result in part and dissenting in part.*

schedule of values downward for certain classes of Taxpayer's personal property, which are quickly rendered obsolete by rapid technological advancements, such as electronic scanning equipment and computers.

Mr. Turner also agreed with Taxpayer and accelerated depreciation for downward adjustments in value on certain classes of equipment that taxpayer had replaced on a more frequent basis than the timelines listed in the depreciation tables. These further downward adjustments from the values in the schedules were required, as Taxpayer argues, to arrive at a lawful "true value in money," notwithstanding that "the equipment [w]as fully functioning and installed into an integrated and operational grocery store," or the personal property is sold in individual units on the open market, rather than sold as fully installed and operative equipment to a competitor as a going concern.

The County cannot have it both ways. Unless otherwise agreed, all personal property, and even more specifically used personal property, is normally sold as individual units, "as-is", "where is" with costs for removal, shipping, and re-installation solely at the buyer's expense.

For example, the United States General Services Administration ("GSA") sells all manner and types of used personal property on its national sales website. General Services Administration, Terms and Conditions, https://gsaauctions.gov/gsaauctions/gsaauctions/. This personal property sale

*Tyson, J., concurring in the result in part and dissenting in part.*

includes, *e.g.*, used ships, helicopters, airplanes, motor vehicles, construction and building equipment, computer and electronic equipment, shelving, restaurant and retail fixtures, and equipment.

The GSA terms of purchase, *inter alia*, to the buyer are:

> 2. CONDITION AND LOCATION OF PROPERTY
> . . . all property listed therein is offered for sale "as is" and "where is". . . the Government makes no warranty, express or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property, or its fitness for any use or purpose.
> . . .
>
> 8. DELIVERY, LOADING, AND REMOVAL OF PROPERTY. a. . . . the Purchaser shall be entitled to obtain the property upon full payment therefor with delivery being made only from the exact place where the property is located. . . . The Purchaser must make all arrangements necessary for packing, removal, and transportation of property."

Gen. Serv. Admin., Standard Form 114C, Sale of Government Property General Sale Terms and Conditions (rev. 4/2001), https://www.gsa.gov/forms-library/sale-government-property-general-sale-terms-and-conditions.

By definition, personal property is stand-alone, movable at the whim of the owner, and, like currency, "knows no home." If personal property is otherwise so aggregated or permanently attached to real property, and "cannot be removed without material injury to the freehold," it becomes a fixture and is valued and assessed as real property. *Ilderton Oil Co. v. Riggs*, 13 N.C. App. 547, 549, 186 S.E.2d

691, 693 (1972) (citation omitted); *Fixture*, Black's Law Dictionary (11th ed. 2019) ("Personal property that is attached to land or a building and that is regarded as an irremovable part of the real property").

Mr. Rolnick, Taxpayer's appraiser, testified used grocery store equipment, equivalent in age and specifications to Taxpayer's property sold for prices drastically below the County's un-adjusted appraised values from the depreciation schedules of values. He testified the market sales tended to show that these low market prices for used grocery store equipment necessitated downward adjustment of any values estimated by depreciation schedules to reflect additional economic and functional obsolescence, that was not captured by the schedules used by the County. He further testified that these further market adjustments resulted in appraisal values consistent with "true value in money."

This evidence was not disputed nor rebutted by the County. Mr. Turner blamed the low values of the used personal property on: (1) consolidation of the grocery retail market; (2) closing of stores that put greater volumes of used equipment on the market; (3) the policy of Taxpayer and other chain grocery stores to not buy used equipment for its stores; and, (4) personal property being sold as individual units and not remaining in place in the closed store, which buildings may be owned by others, and grocers' leases requiring removal of their personal property when the store is closed.

*Tyson, J., concurring in the result in part and dissenting in part.*

None of these factors, individually or in the aggregate, rebut Taxpayer's unchallenged evidence of the personal property's "true value in money." Mr. Turner's analysis of personal property and the PTC's conclusion thereon is arbitrary, unlawful, and is wholly inconsistent with long-established definitions, precedents, and attributes governing personal property.

As stated in the statute, these transactions and factors are only indications of supply and demand in a limited market, in which prices fluctuate and are determined by the

> market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

N.C. Gen. Stat. § 105-283. When the market is limited and supply is abundant, demand, and consequently "true value in money," is lower. *See id.*

## IV. Delivery and Installation Costs

Mr. Turner testified adding delivery and installation costs to the sales price for new equipment to reach the original cost to taxpayer, while failing to do so for sales prices of used equipment, would result in an inflated discrepancy in value that overstated economic obsolescence. Mr. Rolnick testified the additional costs of delivery and installation as well as warranties and guarantees from the seller should

be added to the upfront costs, but not to the secondary used market because those transactions are "as is/where is" sales. These costs should not be added to the price of used equipment. The PTC's conclusion only applied to the installation and delivery costs and failed to recognize and reconcile the bargained-for values in new equipment's warranties, service, and right to return defective products as outlined by Mr. Rolnick.

This fallacy also creates an unequal application and improperly calculates "true value in money." Sellers of used and second-hand equipment offer "as is/where is" transactions, unless otherwise agreed. As was noted in the GSA conditions of sale, Buyers are responsible for moving, installing, and servicing the used equipment. The seller of used equipment does not generally issue a warranty or guarantee to the buyer. Unlike in the new equipment market, if the buyer of used equipment has a problem, they do not contact the seller for service. Sellers of used personal property do not normally provide these benefits to the buyer, and its price should not be attributed to the seller.

## V. Conclusion

We all agree Taxpayer's evidence showed the County had employed an "arbitrary or illegal" method of appraisal to arrive at an improper determination of "true value in money" or "market value." The uncontested evidence also shows "the result arrived at is *substantially* greater than the true value in money of the property

*Tyson, J., concurring in the result in part and dissenting in part.*

assessed, i.e., that the valuation was *unreasonably* high," to reverse the PTC's conclusions of law. *AMP*, 287 N.C. at 563, 215 S.E.2d at 762.

Mr. Turner agreed with Taxpayer that further adjustments were required from the schedule of values on certain personal property, as is acknowledged by the Department of Revenue's guidelines. His analysis and opinions showed nothing to rebut this evidence or to present evidence to meet the statutory definition and mandate for the County to assess the personal property's "true value in money" or "market value." *Id.*

The County failed to rebut and overcome the Taxpayer's evidence of value to support the PTC's conclusions of law. I vote to reverse the order appealed from and respectfully dissent.