In the matter of: The Appeal of Belk-Broome Co. from the Appraisal of Certain Real Property by the Catawba County Board of Equalization and Review for 1991

No. 9310PTC1319

(Filed 18 July 1995)

**Taxation § 82 (NCI4th)— property tax evaluation—anchor department store at mall—method of valuation—effect of operating agreement**

A decision of the Property Tax Commission was remanded for a new hearing where the property was an anchor department store at a mall and the Commission relied on the cost rather than the income approach in reaching its decision. The cost approach is better suited for valuing specialty property or newly developed property; the income approach should be the primary method used to reach a value for this property. The custom when an anchor department store enters a mall is for the anchor to sign an operating agreement with the mall developer which defines the

IN RE APPEAL OF BELK-BROOME CO.

[119 N.C. App. 470 (1995)]

anchor's and developer's obligations. While the Commission viewed the operating agreement as an incumbrance which distorted the results of the income and sales approach valuations and concluded that the only approach which accurately reflected the property's true value was the cost approach, it is not the Commission's place to equalize property values between anchor store property and the surrounding property. The operating agreement is an integral part of the market and the property must be valued according to that market. Placing a lower value on this property solely because it is an anchor store may appear illogical, but this unequal treatment is a part of the market that must be considered. The distinguishing factor between this case and *In re Appeal of Greensboro Office Partnership*, 72 N.C. App. 635, is that the lease in *Greensboro* was a personal encumbrance unique to that property while the operating agreement here is a market standard. N.C.G.S. § 105-345.2(b)(2) and (4).

**Am Jur 2d, State and Local Taxation §§ 704 et seq.**

Appeal by taxpayer from final decision of the North Carolina Property Tax Commission entered 16 August 1993. Heard in the Court of Appeals 26 September 1994.

Taxpayer (Belk) is one of three anchor department stores at the Valley Hills Mall in Hickory, North Carolina. Each of the three anchor stores owns its building, land, and parking area. Belk owns a 164,387 square foot building and 14.39 acres of land. For the 1991 tax year Belk listed its property at 5.5 million dollars. The county assessed it at 10.4 million dollars.

To assist in challenging the County's assessment Belk retained an independent appraiser who used three well accepted methods of valuation to value the property. The appraiser reached a value between $5,525,000 and $6,025,000 using the sales comparison approach, a value of $5,950,000 using the income approach, and a value of $6,000,000 using the cost approach. On appeal, Belk asserts the correct property value is $6,000,000.

At the hearing before the Property Tax Commission (the Commission), Belk and the County were prepared to offer evidence on all three methods of valuation, but, due to prompting by the Commission, the parties primarily concerned themselves with evidence of the income and sales comparison approaches. In reaching its decision, however, the Commission relied exclusively on the cost approach.

IN RE APPEAL OF BELK-BROOME CO.

[119 N.C. App. 470 (1995)]

The cost approach requires the appraiser to determine the cost of land and cost of improvements separately. The combined costs, minus depreciation, constitute the total value of the property. Belk's appraiser valued the land at $1,439,000 and improvements at $4,570,260, which, after rounding, resulted in a value of $6,000,000. Belk's appraiser initially reached a value of $5,888,172 for the cost of improvements, but he deducted $1,317,912 from the reproduction cost of the building for functional obsolescence. The appraiser explained in his report that this deduction was necessary due to the extraordinarily large size of the building. The deduction resulted in the $4,570,260 figure above.

The Commission added Belk's cost of improvements, without the functional obsolescence deduction, to the County's $2,600,100 appraisal of the land, which reduced the County's assessment to $8,489,012. Belk appeals from this decision.

*Manning, Fulton & Skinner, P.A., by Michael T. Medford, for taxpayer-appellant.*

*W. Gene Sigmon and Michael K. Newby for County-appellee.*

JOHNSON, Judge.

We first address Belk's argument that the Commission violated principles of due process by basing its decision exclusively on the cost approach after inducing Belk not to submit evidence on the cost approach. The record reveals that the Commission indicated it would place little reliance on the cost approach and encouraged Belk not to spend time presenting evidence on that approach. Belk accordingly limited its presentation of testimonial evidence and cross-examination on the cost approach. Belk did submit its appraiser's report which contained a cost approach analysis, but Belk contends that this report, without the related testimonial support and cross-examination of the County's appraiser regarding his cost approach analysis, does not cure the constitutional violation.

Although the Commission's action might be criticized, we do not address the constitutional issue. The Commission's decision is reversed on other grounds.

Belk argues that the Commission overvalued its property because it relied on improper valuation methodologies, and misinterpreted the applicable case law governing assessments for ad valorem taxation. The standard of review for appeals from the Commission is found in

**IN RE APPEAL OF BELK-BROOME CO.**

[119 N.C. App. 470 (1995)]

North Carolina General Statutes § 105-345.2(b) (1992), which provides that this Court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action." It further provides that we may reverse, remand, modify, or declare void the Commission's decision if the appellant is prejudiced because the Commission's decision is

(1) In violation of constitutional provisions; or

(2) In excess of statutory authority or jurisdiction of the Commission; or

(3) Made upon unlawful proceedings; or

(4) Affected by other errors of law; or

(5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or

(6) Arbitrary or capricious.

*Id.*

It is "a sound and a fundamental principle of law in this State that ad valorem tax assessments are presumed to be correct[,]" but the presumption is one of fact and is therefore rebuttable. *In re Appeal of Amp, Inc.*, 287 N.C. 547, 562, 215 S.E.2d 752, 761 (1975). To rebut the presumption, Belk must produce " 'competent, material and substantial' evidence that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of valuation; AND (3) the assessment *substantially* exceeded the true value in money of the property." *Id.* at 563, 215 S.E.2d at 762. The County is required to value all property for ad valorem tax purposes at its true value in money, which is its "market value." North Carolina General Statutes § 105-283 (1992). Market value is defined in the statute as

the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

*Id.* An important factor in determining the property's market value is its highest and best use. *Rainbow Springs Partnership v. County of*

*Macon,* 79 N.C. App. 335, 339 S.E.2d 681, *disc. review denied,* 316 N.C. 734, 345 S.E.2d 392 (1986). The Belk property must be valued at its highest and best use, which the parties agree is its present use as an anchor department store. Therefore, the County, and the Commission, are required to use a valuation methodology that reflects what willing buyers in the market for anchor department stores will pay for the subject property. In doing so, the County must "consider at least [the property's] . . . past income; probable future income; and any other factors that may affect its value." North Carolina General Statutes § 105-317(a)(2) (1992).

The first matter is to determine the correct approach to valuation. For reasons we will address later, the Commission determined that the cost approach was the correct approach. Belk urges the income approach. Neither party advocates using the sales comparison approach.

It is generally accepted that the income approach is the most reliable method in reaching the market value of investment property. *Coastal Eagle Point Oil Co. v. West Deptford Township,* 13 N.J. Tax 242 (1993) (and authorities cited therein). *See also G.R.F. Inc. v. Bd. of Assessors of Cty. of Nassau,* 362 N.E.2d 597, 598 (N.Y. 1977) (where the court recognized that the income approach "generally provides an acceptable and, in the absence of market data, a preferred method of valuing rental property") and *Montgomery Ward & Co. v. County of Hennepin,* 482 N.W.2d 785 (Minn. 1992). The cost approach is better suited for valuing specialty property or newly developed property; when applied to other property, the cost approach receives more criticism than praise. For example, the cost approach's primary use is to establish a ceiling on valuation, rather than actual market value. *G.R.F.,* 362 N.E.2d 597. It seems to be used most often when no other method will yield a realistic value. The modern appraisal practice is to use cost approach as a secondary approach "because cost may not effectively reflect market conditions." *Oil Co.,* 13 N.J. Tax 242, 288 (citations omitted).

We conclude that the income approach should be the primary method used to reach a value for the Belk property. We are mindful, however, that while the income approach is preferential, a combination of approaches may be used because of the inherent weaknesses in each approach. We do not foreclose using such a combination of approaches here so long as the income approach is given greatest weight.

**IN RE APPEAL OF BELK-BROOME CO.**

[119 N.C. App. 470 (1995)]

On remand, the Commission should be aware that the figures in the County's income approach are invalid. The income approach arrives at valuation by applying a capitalization rate to the property's potential to generate income, plus or minus certain minor adjustments. Both Belk and the County agree that the correct capitalization rate is 9.5. The property's ability to generate income is represented by the market rental value of the property. Belk's appraiser determined that the Belk property rental value was $3.50 per square foot. The County's rental value figure was $6.50 per square foot.

Based on the record, it is apparent that the County used either an allocation approach, wherein the entire mall was valued and value was allocated among all of the space at the mall according to square footage, or the County calculated the cost of reproduction and backed into the rent per square foot by calculating what the rental value would have to be in order to guarantee a return on investment. The allocation approach, by the County's own admission, transfers value from the in-line stores. In other words, the owner of the anchor store is taxed for the in-line property he does not own. The return-on-investment approach gives no consideration to market rent. It arrives at a rental value based solely on a formula for calculating return on investment, with no consideration of the actual market or external influences on the particular property being valued as required by North Carolina General Statutes § 105-317. Belk unquestionably carried its burden of showing that the County's valuation, under the income approach, was reached in an improper manner. We also note that the County's appraiser seemingly agreed that $3.50 per square foot is the market rental value for anchor department stores.

The Commission, while recognizing that another department store would only pay Belk's suggested value, used the cost approach to establish a higher value for the property. The Commission determined that the cost approach was the only approach which would accurately value the property. This decision was based upon the unique relationship between anchor department stores and mall developers.

When a mall developer decides to build a mall, the developer must secure anchor department stores, like Belk, before development begins. The anchor store is necessary to draw customers to the mall, and thereby draw shops and stores that will lease space in the in-line portion of the mall. Without the anchor department stores, the mall will not survive. Therefore, developers are willing to make monetary

concessions to attract anchor stores. These concessions consist of lower rental rates or lowered purchase prices. In short, the developer subsidizes the anchor department stores.

The developer has good reason for offering these subsidies. Not only do the anchor stores attract smaller stores and shops to the in-line spaces, their presence allows the developer to drive up the rent for in-line spaces. The value of the subsidy is at least partially regained in the increased rental value of the in-line space. In effect, all or part of the value of the subsidy is taken from the anchor department store and transferred to the in-line portion of the mall, where presumably the County will capture taxes on the transferred value.

Belk and the County agree that when an anchor department store enters a mall, the custom is for the anchor to sign an operating agreement with the mall developer. These operating agreements define the anchor's and developer's rights and obligations. The most significant features of the operating agreement, for the purpose of this appeal, are the anchor store's obligation to operate only as a department store and the corresponding obligation not to sell the property to any entity other than an acceptable anchor department store.

The effect of the operating agreement on the value of the property is the main point of contention between Belk and the County. The Commission viewed the operating agreement as an encumbrance on the property which distorted the results of Belk's appraiser's income and sales approach valuations. The Commission used a "bundle of rights" analogy in reaching this conclusion. According to the Commission, the operating agreement removed some of the rights from the bundle of fee ownership rights because it limited the property's use and restricted the sale of the property to a limited group of buyers. From this standpoint, the Commission concluded that when Belk's appraiser valued the property, he valued only a partial interest in the property. The Commission further concluded that because of the effect of operating agreements on anchor store property, the only approach which accurately reflected the property's true value was the cost approach.

We find error in the Commission's decision to rely solely on the cost approach. The Commission explained its decision as follows:

The Commission concludes as a matter of law that the estimates of value found by Mr. Lambert in Taxpayer Exhibit 1 violate the rule laid down by this Commission and affirmed by the North

Carolina Court of Appeals in *In re Greensboro Office Partnership*, 72 N.C. App. 635, 325 S.E.2d 24, *cert. denied*, 313 N.C. 602, 330 S.E.2d 610 (1985). Mr. Lambert applied the Cost, Income and Sales approaches in a manner which is calculated to determine the value only of a <u>partial</u> interest in the subject land and improvements. His estimates under these three approaches arrived at the value of <u>part</u> of the bundle of rights in the subject property, not of the entire bundle of rights. Under North Carolina law, all appraisals of property for property tax purposes must determine the value of the entire bundle of rights. This is true whether or not the owner has bargained away some of his rights. Like the property owner in the *Greensboro* case, the Taxpayer here does not <u>have</u> the entire bundle of rights, and seeks to have only his partial interest appraised. North Carolina law simply does not permit this. The owner is treated as if he owns the entire bundle of rights, even though he may have bargained some of them away. This is precisely the point settled in the *Greensboro* case.

. . .

The "property" to be appraised consists of all the rights and interests in the property that are capable of private ownership. This is variously described as the unencumbered fee simple interest or the "whole bundle of rights." <u>Property</u> is appraised without regard to the various <u>privately created</u> encumbrances affecting it. While publicly created encumbrances such as zoning are considered in appraisals for property tax purposes, private encumbrances such as leases or the operating agreements considered here are not.

The Commission continued:

Because practices in this industry are relatively standardized, the rental rates and sales prices examined by Mr. Lambert are <u>all</u> reflective of rentals and sales of partial interests, and do not reflect the value of the entire interest. Under these circumstances, only the cost approach, properly applied, can generate an estimate of the value of the whole bundle of rights in the property.

To the degree that the Commission's decision is based on *Greensboro*, it is based on a misinterpretation of the law. *Greensboro* stands for the proposition that the value of property must be based on

the market, not good or bad business transactions. In *Greensboro*, the taxpayer owned an office building which was encumbered by a long-term lease at below market rent. The taxpayer argued that the property should be valued based on the actual contract rents received under the existing lease. The *Greensboro* Court held that the County should value the property using the market rental value. The distinguishing factor between the present case and *Greensboro* is that the lease in *Greensboro* was a personal encumbrance unique to that property, whereas the operating agreement in this case is a market standard.

The Commission recognized that there was a market for the Belk property. The operating agreement is an integral part of that market, a point which is at least implicit in the Commission's order. The property must be valued according to that market. North Carolina General Statutes § 105-283. Placing a lower value on this property solely because it is an anchor store may appear illogical, but this unequal treatment is a part of the market that must be considered. Other courts faced with similar questions have reached the same conclusion regarding the unequal treatment given to anchor stores:

> [T]he marketplace created the field. It is not the assessor's function to change market place "playing fields." It is his duty to tax market places as he finds them. In that process the individual assessor's sense of marketplace business morality has no place. If that marketplace "playing field" needs leveling it is, solely, absent any illegality, the function of the legislature to make those changes.

*Supervisor v. Berman*, 569 A.2d 706, 710 n.4 (Md. App.), *cert. denied*, 573 A.2d 1337 (Md. 1990). We agree that it is up to our legislature to change the method of valuing anchor department stores if the market value standard is no longer appropriate.

We find further support in the opinions of the New York and Arizona appellate courts. In *G.R.F., Inc. v. Bd. of Assessors Cty. of Nassau*, 362 N.E.2d 597, the Court of Appeals of New York was presented with the question of how to value an anchor department store for property tax purposes. In that case, a shopping center developer donated the land on which the taxpayer agreed to operate an anchor department store. The developer also donated over one million dollars towards construction of the building and guaranteed minimum gross annual sales of $14,000,000.

The evidence in *G.R.F.* showed, as it does in our case, that the developer subsidized construction of the anchor store, and that he would have charged lower rent to an anchor store if the property had been rented because the anchor's presence drove up the rental value of the smaller stores. The New York Court determined that the cost approach would overvalue the anchor store property and allowed a combination of the cost approach and the income approach to value the property. The Court reasoned as follows:

> [T]o the extent that [an anchor] store is an attraction to the satellite tenants, part of the cost of construction may reflect not value to the [anchor] store, but value to the remainder of the typical shopping center. That value, in turn, is reflected in the increased rental value of the shopping center property other than the [anchor] store, and, presumably, in the tax assessment of the whole shopping center property. On this view, it would be inequitable to assess the . . . property on the basis of reproduction cost less depreciation.

*G.R.F.*, 362 N.E.2d at 599.

In the Arizona case, the taxpayer and County agreed that the income approach was the correct approach for valuing an anchor department store, but the parties arrived at vastly different values based on that approach. The difference was due to the different rental rates applied by each party. The taxpayer used market rates for anchor department stores, while the County increased its rental value figure to reflect the higher rent which the property would have brought had it not been an anchor store. The Court rejected the County's argument that the rental value should be increased, stating that the fair market value was correctly measured as "suited to a major anchor tenant." *Magna Invs. & Development Corp. v. Pima Cty.*, 625 P.2d 354, 359 (Ariz. App. 1981).

The Commission attempts to justify its placement of a higher value on the Belk property by explaining that IBM or Glaxo would pay more for the property than an anchor department store. This reasoning is unpersuasive in light of the Commission's finding that the highest and best use of the property is its present use as a department store. We find irrelevant what another type of business might pay for the property when the property is currently being used at its highest and best use.

In addition, the Commission finds elsewhere in its order that mall developers will never sell anchor store space to businesses such as Glaxo or IBM. This finding further emphasizes the need to value the Belk property according to the limited market in which it exists. The reality is that anchor store property will be sold only to another anchor department store chain, and another anchor department store chain will pay only the relatively low value which the market places on these properties, whether that value be due to the operating agreement or some other market function.

The County and Commission must take the property as it finds it. It is not the Commission's place to equalize property values between anchor store property and the surrounding property. In doing so, the Commission exceeded its authority and committed an error of law. North Carolina General Statutes § 105-345.2(b)(2) and (4). Therefore, we reverse and remand for a new hearing at which the Commission will redetermine the Belk property value with emphasis on the income approach to valuation.

Reversed and remanded.

Judges COZORT and GREENE concur.