IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-969

Filed 16 July 2024

Property Tax Commission, No. 19 PTC 0358

IN THE MATTER OF THE APPEAL OF:

ASHLEY FURNITURE INDUSTRIES, INC, Appellant,

From the decision of the Davie County Board of Equalization and Review concerning the valuation of certain property for tax years 2018 and 2019.

Appeal by Ashley Furniture Industries, Inc., from final decision entered 24 March 2023 by the North Carolina Property Tax Commission sitting as the State Board of Equalization and Review. Heard in the Court of Appeals 30 April 2024.

> *Maynard Nexsen PC, by David P. Ferrell, Janet L. Shires, and George T. Smith, for Appellant Ashley Furniture Industries, Inc.*
>
> *Parker Poe Adams & Bernstein LLP, by Collier R. Marsh and Charles C. Meeker, for Appellee Davie County.*

COLLINS, Judge.

Ashley Furniture Industries, Inc., ("Ashley") appeals from a final decision of the North Carolina Property Tax Commission ("Commission") valuing certain property for tax years 2018 and 2019. Ashley argues that the Commission erred by using the income approach to value the property or, in the alternative, erroneously applied the income approach. Ashley also argues that the Commission erroneously applied the cost approach. We affirm the Commission's final decision.

## I.    Background

Ashley purchased an approximately 310-acre parcel of land in Davie County ("Subject Property") in 2012.  At the time of the purchase, the Subject Property contained: (1) an approximately 435,000 square-foot primary building; (2) an approximately 81,000 square-foot bedding facility; (3) an approximately 17,000 square-foot truck facility; (4) 32 detached sheds, each approximately 37,000 square feet; (5) an approximately 1,180 square-foot welcome center; and (6) two pump houses, totaling approximately 2,800 square feet.  Ashley expanded the primary building by approximately 1,120,000 square feet and renovated two sheds between 2012 and 2017.  In 2018, Ashley expanded the truck facility by approximately 5,100 square feet.

In 2017, Davie County reassessed the Subject Property as part of its general reassessment.   At that time, the assessment increased from $70,851,550 to $87,836,890.  Ashley did not appeal the 2017 assessment.  The Subject Property was again assessed at $87,836,890 in 2018.  By letter dated 21 May 2018, Ashley appealed the 2018 assessment to the Davie County Board of Equalization and Review ("Board") and requested that the County reduce the Subject Property's value to $59,981,700. In support of its request, Ashley stated, among other things, that "[a]s of January 2017, the proeprty (sic) only underwent new construction and renovations at a total cost of $51,328,890 post a $10M acquisition."   The Subject Property was again assessed at $87,836,890 in 2019, and Ashley appealed.  The matter was heard by the

Board on 30 July 2019, at which point the assessments for both 2018 and 2019 were considered.

The Board issued a decision valuing the Subject Property at $69,454,448 for 2018 and a separate decision valuing the Subject Property at $69,550,441 for 2019 to account for the truck facility expansion. Ashley appealed those decisions to the North Carolina Property Tax Commission ("Commission"). In its notices of appeal, Ashley valued the Subject Property at $29,500,000 for 2018 and $30,000,000 for 2019 and alleged that the Board "employed an arbitrary and/or illegal method of appraisal in reaching the assessed value that the [Board] assigned to the subject property for the year[s] at issue" and "assigned a value to the subject property that substantially exceeded its true value in money as of January 1 for the year[s] at issue[.]"

The matter came on for hearing before the Commission on 13 December 2022. Ashley submitted an appraisal report prepared by Richard Marchitelli, a certified general real estate appraiser for Cushman & Wakefield and a Member of the Appraisal Institute, Counselor of Real Estate, and Fellow of the Royal Institution of Chartered Surveyors. For his appraisal, Marchitelli divided the property into two sub-elements: Unit B comprised the 30 unrenovated sheds, and Unit A comprised the remainder of the Subject Property. Marchitelli concluded that "the sales comparison approach is the only applicable approach in developing a credible value opinion for Economic Unit A" and, using this approach, appraised Unit A at $30,530,000 in 2018 and $30,620,000 in 2019. Marchitelli appraised Unit B at $3,760,000 in 2018 and

2019 using the cost approach. Accordingly, Marchitelli opined that the true value of the Subject Property was $34,290,000 for 2018 and $34,380,000 for 2019.

The County submitted an appraisal report prepared by Richard Brant, a certified general real estate appraiser for the Loftis Appraisal Company and a Member of the Appraisal Institute. Brant divided the Subject Property into the following sub-elements: (1) primary building; (2) bedding facility; (3) truck facility; (4) sheds; (5) welcome center; and (6) pump houses. Brant appraised each sub-element using all three methods of valuation: the income approach, the cost approach, and the sales comparison approach. He then combined the appraised value of the sub-elements to derive an appraisal for the Subject Property for each method of valuation. Brant opined that the true value of the Subject Property for 2018 was: (1) $69,449,949 using the income approach; (2) $69,476,426 using the cost approach; and (3) $74,237,952 using the sales comparison approach. Placing "only limited weight" on the income approach, "very little weight" on the cost approach, and "[c]onsiderable weight" on the sales comparison approach, Brant reconciled the three values for a final opinion of value of $72,000,000 for 2018. Brant opined that the true value of the Subject Property for 2019 was: (1) $70,907,906 using the income approach; (2) $70,848,069 using the cost approach; and (3) $75,313,272 using the sales comparison approach. Placing the "greatest weight" on the sales comparison approach, Brant reconciled the three values for a final opinion of value of $73,200,000 for 2019.

The Commission entered a final decision on 24 March 2023 valuing the Subject Property at $60,000,000 for 2018 and $60,100,000 for 2019. Ashley appealed.

## II. Discussion

Ashley argues that the Commission erred by using the income approach to value the Subject Property (excluding the sheds) or, in the alternative, erroneously applied the income approach. Ashley also argues that the Commission erroneously applied the cost approach to value the Subject Property, excluding the sheds. Ashley does not argue that the Commission erred by using the cost approach to value the sheds, nor does it argue that the Commission erred in its application of the cost approach to the sheds.

When reviewing decisions of the Commission, this Court

> may affirm or reverse the decision of the Commission, declare the decision null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions, or decisions are any of the following:
>
> (1) In violation of constitutional provisions.
>
> (2) In excess of statutory authority or jurisdiction of the Commission.
>
> (3) Made upon unlawful proceedings.
>
> (4) Affected by other errors of law.
>
> (5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted.
>
> (6) Arbitrary or capricious.

N.C. Gen. Stat. § 105-345.2(b) (2023).

Our Supreme Court has noted that "[a]n act is arbitrary when it is done without adequate determining principle[.]" *In re Hous. Auth. of Salisbury*, 235 N.C. 463, 468, 70 S.E.2d 500, 503 (1952). Moreover, "[a]n act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles." *Id.* (citations omitted). "In short, when these terms are applied to discretionary acts, such as the determinations of the Commission, they ordinarily denote abuse of discretion, though they do not signify nor necessarily imply bad faith." *In re Parkdale Mills*, 225 N.C. App. 713, 715, 741 S.E.2d 416, 419 (2013) (quotation marks and citations omitted). "Determination of whether conduct is arbitrary and capricious or an abuse of discretion is a conclusion of law." *Id.* (quotation marks and citations omitted).

We review a decision of the Commission under the whole record test to determine whether the decision has a rational basis in the evidence. *In re Parkdale Am.*, 212 N.C. App. 192, 194, 710 S.E.2d 449, 450 (2011). The whole record test "does not allow the reviewing court to replace the Commission's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*." *In re Parkdale Mills*, 225 N.C. App. at 716, 741 S.E.2d at 419 (brackets omitted). Rather, the whole record test "requires the court, in determining the substantiality of evidence supporting the Commission's decision, to take into account whatever in the record fairly detracts

from the weight of the Commission's evidence." *Id.* (brackets omitted). "If the Commission's decision, considered in the light of the foregoing rules, is supported by substantial evidence, it cannot be overturned." *In re Philip Morris U.S.A.*, 130 N.C. App. 529, 533, 503 S.E.2d 679, 682 (1998) (citations omitted).

"It is presumed that *ad valorem* tax assessments are correct and that the tax assessors acted in good faith in reaching a valid decision." *In re Owens*, 144 N.C. App. 349, 352, 547 S.E.2d 827, 829 (2001) (citation omitted). "This presumption may be rebutted by material, substantial, and competent evidence that an arbitrary or illegal method of valuation was used and the assessment substantially exceeded the true value in money of the property." *In re Philip Morris U.S.A.*, 130 N.C. App. at 533, 503 S.E.2d at 682 (citations omitted). "Once a taxpayer produces sufficient competent, material and substantial evidence to rebut the presumption of correctness, the burden of proof then shifts to the taxing authority and the taxing authority must demonstrate its methods produce true value." *In re Blue Ridge Mall LLC*, 214 N.C. App. 263, 267, 713 S.E.2d 779, 782 (2011) (citation omitted). "To determine the appropriate appraisal methodology under the given circumstances, the Commission must hear the evidence of both sides, to determine its weight and sufficiency and the credibility of witnesses, to draw inferences, and to appraise conflicting and circumstantial evidence, all in order to determine whether the Department met its burden." *In re Parkdale Mills*, 225 N.C. App. at 717, 741 S.E.2d at 420 (quotation marks and citations omitted).

"All property, real and personal, shall as far as practicable be appraised or valued at its true value in money." N.C. Gen. Stat. § 105-283 (2023). When used in this context, true value

> shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

*Id.*

N.C. Gen. Stat. § 105-317 governs appraisals of real property and provides that persons making appraisals have the following duties:

> (1) In determining the true value of land, to consider as to each tract, parcel, or lot separately listed at least its advantages and disadvantages as to location; zoning; quality of soil; waterpower; water privileges; dedication as a nature preserve; conservation or preservation agreements; mineral, quarry, or other valuable deposits; fertility; adaptability for agricultural, timber-producing, commercial, industrial, or other uses; past income; probable future income; and any other factors that may affect its value . . . .
>
> (2) In determining the true value of a building or other improvement, to consider at least its location; type of construction; age; replacement cost; cost; adaptability for residence, commercial, industrial, or other uses; past income; probable future income; and any other factors that may affect its value.

*Id.* § 105-317(a)(1), (2) (2023). "An important factor in determining the property's market value is its highest and best use." *In re Belk-Broome Co.*, 119 N.C. App. 470,

473, 458 S.E.2d 921, 923 (1995) (citations omitted), *aff'd per curiam*, 342 N.C. 890, 467 S.E.2d 242 (1996).

N.C. Gen. Stat. § 105-317 has been interpreted as authorizing three property valuation methods: (1) the income approach, (2) the cost approach, and (3) the sales comparison approach. *In re Owens*, 144 N.C. App. at 353, 547 S.E.2d at 829. "However, the general statutes nowhere mandate that any particular method of valuation be used at all times and in all places." *In re Greens of Pine Glen Ltd.*, 356 N.C. 642, 648, 576 S.E.2d 316, 320 (2003). "In light of the innumerable possible situations that may arise, authorities that have the obligation of assigning a value to land sensibly are given discretion to apply the method that most accurately captures the 'true value' of the property in question." *Id.*

"It is generally accepted that the income approach is the most reliable method in reaching the market value of investment property." *In re Belk-Broome Co.*, 119 N.C. App. at 474, 458 S.E.2d at 924 (citations omitted). "Under the income approach, an appraiser calculates the economic rent the property earns and deducts normal operating expenses to arrive at net operating income." *Dep't of Transp. v. Fleming*, 112 N.C. App. 580, 583, 436 S.E.2d 407, 409 (1993). The net operating income is then divided by a capitalization rate to determine the fair market value of the property. *Id.* The capitalization rate is the "interest rate used in calculating the present value of future periodic payments." *Capitalization Rate, Black's Law Dictionary* (11th ed. 2019).

Generally, "[t]he cost approach is better suited for valuing specialty property or newly developed property" and is "used most often when no other method will yield a realistic value." *In re Belk-Broome Co.*, 119 N.C. App. at 474, 458 S.E.2d at 924. "Part of the cost approach is deducting for depreciation, which is a loss of utility and, hence, value from any cause . . . [representing] the difference between cost new on the date of appraisal and present market value." *In re Stroh Brewery Co.*, 116 N.C. App. 178, 186, 447 S.E.2d 803, 807 (1994) (quotation marks and citation omitted). "Depreciation may be caused by deterioration, which is a physical impairment such as structural defects, or by obsolescence, which is an impairment of desirability or usefulness brought about by changes in design standards (*functional obsolescence*) or factors external to the property (*economic obsolescence*)." *Id.* (quotation marks and citations omitted).

"The sales comparison approach compares the subject property with market data based upon an appropriate unit of comparison." *See In re Lane Co.-Hickory Chair Div.*, 153 N.C. App. 119, 122, 571 S.E.2d 224, 226 (2002). Under the sales comparison approach, "[t]he prices achieved from the recent sales of comparable properties are analyzed and adjusted for differences in location, size, age, condition, date of sale, special suitability or any other appropriate factor, and then the adjusted price is applied to arrive at a value for the property under consideration." Damien Abbott, *Encyclopedia of Real Est. Terms* 1036 (Delta Alpha Publishing, 2d ed. 2000) (quotation marks omitted). "This method is limited by the availability of data on

recent and directly comparable property, but it is the most reliable and accepted method of appraising real estate." *Id.*

## A. Income Approach

Ashley argues that the Commission's decision to use the income approach rather than the sales comparison approach was arbitrary because it was "not only contrary to both appraisers' methodologies, but also contrary to how willing buyers would determine a value for the Subject Property." In the alternative, Ashley argues that the Commission erred by "failing to properly conduct its income approach valuation for the Subject Property." (capitalization altered).

Here, the Commission made the following findings of fact relevant to its decision to use the income approach and its valuation using this approach:

> 5. The opinion expressed by the Appellant's expert appraisal witness, Mr. Richard Marchitelli, is that "the highest and best use of the subject property is as a manufacturing, warehousing, and distribution facility as it is currently improved." The opinion expressed by the County's expert appraisal witness, Mr. Richard Brant, is notably less succinct, but nonetheless indicates a substantially similar highest and best use: as to the original building, the addition, and the truck facility, the highest and best use is continued use as improved; as to the bedding facility, originally used by the Appellant in the manufacture of bedding materials but recently used primarily for storage, the highest and best use is as manufacturing space; and as to the unrenovated sheds, used in part by the Appellant for storage, the highest and best use is continued use as storage. While we note that the original bedding facility was perhaps built for a purpose other than manufacturing, and we note that the original purpose of the unrenovated sheds may have been

for something other than storage, we find it reasonable that the highest and best use of these facilities is manufacturing and storage, respectively. Accordingly, we find that the highest and best use of the subject property as a whole is for manufacturing, warehousing, and distribution, as currently improved.

. . . .

7. Mr. Marchitelli, the appellant's expert appraisal witness, explained that he had approached the appraisal of the subject property as a whole by appraising two subelements, one of which consisted of the 31 unrenovated sheds (adjusting this figure to 30 to reflect the 2017 renovation of Shed #11 for his opinion of value as of 2018). Mr. Marchitelli designated the unrenovated sheds as "Unit B," and designated the remainder of the property, including all land and all remaining improvements, as "Unit A." Furthermore, Mr. Marchitelli's appraisal began with an opinion of value as of January 1, 2017 (which year is not a part of this appeal), with adjustments made to the 2018 and 2019 values to reflect changes made to the property during 2017 and 2018, respectively.

. . . .

11. Mr. Marchitelli appraised Unit A by relying on the sales comparison approach. We recall that his designation of Unit A included the land and all improvements on the subject property other than the unrenovated sheds . . . . At the hearing, Mr. Marchitelli testified as to his opinion that there was no sale of a property that is perfectly comparable to Unit A of the subject property, and that he had therefore considered the sale of five properties that he determined to be most comparable to Unit A . . . .

12. Whereas Mr. Marchitelli determined Unit A to have approximately 1,700,000 square feet of building area, only Comparable 3 has a similar amount (approximately 1,900,000 square feet) of building area. Comparable 2, at 750,000 square feet, is nearly 1 million square feet smaller than Unit A, and the remaining properties offered as comparable are less than 529,000 square feet in size. Similarly, the land area of Unit A is approximately 310

acres, but the land area of the properties offered as comparable ranges from approximately 183 acres for the largest, down to approximately 42 acres for the smallest. Mr. Marchitelli further lists comparisons between Unit A and the comparable sales for the number of truck doors (219 for Unit A and 27 to 114 for the comparables); for the ceiling height (the ceiling height in the 1,120,000 square foot addition portion of Unit A is 46 feet, with the remainder of Unit A ranging down to 21.3 feet, as compared to a range of 16 to 32 feet of ceiling height for four of the comparable properties—only Comparable 5 has a ceiling height of up to 48 feet); for the percentage of total building area dedicated to office space (5.2% for Unit A and 1.31% to 7.57% for the comparables); and for the number of parking spaces (2,729 for Unit A and 116 to 1,600 for the comparables).

13. Mr. Marchitelli testified that he applied time adjustments to the sale prices of the comparable properties in order to account for differences in market conditions between the time of the sales and the appraisal date of January 1, 2017, and relied on published regional rental data for industrial buildings in order to estimate the changes in market conditions . . . . For the differences in the physical characteristics of building size; ratio of land size to building size; ratio of building size to number of truck doors; ratio of building size to parking spaces; percentage of building size dedicated to office space; and ceiling height, Mr. Marchitelli made positive or negative adjustments to account for difference between the comparable properties and Unit A, where warranted according to his judgment . . . . Mr. Marchitelli determined that no adjustments were warranted for the differences in the age and condition of the sale properties, as compared to Unit A, but applied positive and negative adjustments of either 5% or 10% to all other differences that he deemed appropriate . . . .

. . . .

18. With the exception of the time adjustments for market conditions, we find these adjustments somewhat puzzling

overall. As described above, there are significant quantitative differences in several of the physical characteristics that have been identified in the appraisal report as relevant to the value of Unit A, but every adjustment made to the comparable property sale prices is simply a 5% or 10% change, in a positive or negative direction. There is little discussion in the appraisal report of the rationale behind the choice to limit these adjustments to 5% or 10% and, unlike with the time adjustments for market conditions, there is little discussion of actual market evidence in support of the adjustments for differences in physical characteristics.

. . . .

20. . . . . Mr. Marchitelli explained that, as to Unit A, he had considered both the income approach and the cost approach, but had not developed either approach for his appraisal, opting instead to rely solely on the sales comparison approach. . . .

. . . .

27. The County's appraisal witness, Mr. Rick Brant, also approached the appraisal of the subject property by considering its subelements separately, and did so in a more granular way, developing individual values for the land, site improvements, the primary building (for which he considered separately the original building and the addition), the bedding facility, the truck facility, the 32 sheds (Mr. Brant considered Shed #43 to be partially finished, and did not distinguish it from the other sheds), the welcome center, and two separate pump houses. Mr. Brant explained his approach as one that relied on readily available market information for the subelements as an alternative to extracting less reliable information from sales of dissimilar properties that required substantial adjustments due to the divergent uses found on the subject property. Although he testified that he placed the greatest emphasis on the sales comparison approach, Mr. Brant testified that he had developed all three approaches to value for the subject as a test of the reasonableness of his conclusions.

. . . .

34. Mr. Brant explained that, in reviewing the sales of properties that he considered comparable to the various subelements of the subject property, he allocated a portion of the sale price to the land conveyed in the sale, and allocated the remainder of the sale price to the improvements conveyed in the sale, in order to isolate the improvement value from the underlying land value, and thereby eliminate the effects of land-related factors, such as location and land size, from the sale prices. Mr. Brant testified that this approach also enabled him to select properties of similar utility that were as close in proximity as possible to the subject property.

35. Mr. Brant's appraisal report proceeds as generally expected. Four sales are offered as comparable for each of the subject property's subelements, and there are four such subelements (the primary building, the bedding facility, the truck facility, and the sheds) remaining for consideration, for a total of sixteen sales. Mr. Brant allocates a portion of the sale prices to land value, and makes various adjustments to account for differences between the sale properties and the respective subelements being considered . . . . We do not address these sales in detail here, in part because we see some of the same issues raised by the earlier report—for example, the lack of explanation for the positive and negative adjustments made to the sale prices, in addition to the broader range (negative 15% to positive 15%) of adjustments that are applied. Most puzzling, however, is the lack of explanation for the amount of the sale price allocated to land value. For example, the land value allocations listed on page 59 of the report indicate that values ranging from $26,000 per acre to $46,000 per acre have been attributed to the land for the respective sales, but without any explanation of the basis for those allocations. Without evidence enabling us to understand and appreciate the validity of the land allocation, we have no context for evaluating the reliability of the remaining value allocated to the improvements. Accordingly, we have ultimately placed little emphasis on the sales comparison

approach offered by the County. . . .

36. Mr. Brant next developed an income approach to appraising the subject property by estimating the net operating income ("NOI") for each of the four subelements (the primary building, the bedding facility, the truck facility, and the sheds), and then directly capitalizing each NOI at a rate he believed appropriate to each subelement. For the primary building, Mr. Brant considered triple net leases in place for four other properties that he described as large warehouse/manufacturing facilities, and that he considered comparable to the primary building. These properties reported lease rates ranging from $2.13 to $5.50 per square foot, which Mr. Brant modified to a range of $2.56 to $4.13 per square foot, after applying various adjustments without further explanation. From these figures, Mr. Brant determined that an appropriate rental rate for the primary building was $3.00 per square foot, resulting in an estimated potential gross income of $4,659,409 for the subject property. Although no market data is shown in in (sic) the appraisal report to support the reductions, Mr. Brant estimated a 5% vacancy rate for the primary building, and further reduced the estimated effective gross income for the primary building with estimates of management (3%) and replacement reserves (2%), ultimately arriving at an NOI of $4,171,731 for the primary building . . . . We note here that, although the leased properties are offered as comparable to the primary building, the largest of the properties (at 526,320 square feet) is only about one-third the size of the primary building (1,553,103 square foot). Furthermore, gross adjustments to the leased properties range from 30% to 60%, which we find to be significant adjustments for properties that are offered as comparable.

. . . .

50. Overall, we find that the income approach developed here for the subject property contains both too much and too little information. . . . [A]lthough the subelements are all considered by Mr. Brant to be part of an industrial warehouse and distribution facility, differences are

assumed for rental, vacancy and capitalization rates, without further explanation for the recharacterization of the subelements or for the choice of these rates, all of which have significant impact on the value of each subelement and, therefore, the subject property as a whole. While we understand that an appraisal report represents the writer's professional opinion, there is insufficient evidence before us to enable us, as the report's readers, to evaluate the reasonableness of the opinion. Accordingly, we place little weight on the income approach conclusions.

. . . .

52. We find that neither of the appraisal reports discussed provides a compelling conclusion of value. We do note, however, that the appraisal prepared for the County provides a greater number of options in support of its opinion, since all three approaches to value have been developed for each subelement of the subject property, whereas the appraisal prepared for the Appellant relies on a single approach to value for the subelements it considers. Our determination of value is therefore based upon all information received from the parties, rather than from a single party's opinion.

53. We find that the primary building, and especially the newly-constructed addition, represents the greatest single element of value for the subject property, and therefore the greatest influence on the overall value of the subject property. We have previously found that the highest and best use of the subject property is for manufacturing, warehousing, and distribution, as currently improved. Our preference would therefore be to consider the sales of properties comparable to the subject property, but the sale properties offered by the parties as comparable to the subject are not truly comparable, and cannot be made so without such adjustments and assumptions as to render them unreliable.

. . . .

55. We approach the determination of value for the remainder of the property by initially considering the income approach. By applying a rate of $3.00 per square

foot to the approximately 1,700,000 square feet of the facility (excluding the sheds), we derive a potential gross income of $5,100,000 for the subject property. Reducing this figure by a 10% net adjustment for vacancy, management, and replacement reserves yields a NOI of $4,590,000. Capitalizing the NOI by 8% (a figure near the average of the reported 4.49% to 12.09% range for the subject property type, and excluding the local property tax burden that would be carried by the tenant) yields an estimated value of $57,000,000 (rounded) for the remainder of the subject property. Under this approach, the combined value of the subject property would be $60,000,000 ($3,000,000 for the sheds and $57,000,000 for the remainder).

. . . .

57. We find, therefore, that the true value of the subject property was $60,000,000 as of January 1, 2018. The parties have separately determined that the value added to the subject property for 2019 was either $90,000 (according to the County) or $100,000 (according to the Appellant). From these estimates, we find that the true value of the subject property as of January 1, 2019 was $60,100,000.

(footnotes omitted).

Ashley submitted an appraisal report prepared by Richard Marchitelli. Marchitelli divided the Subject Property into two sub-elements: Unit B comprised the 30 unrenovated sheds, and Unit A comprised the remainder of the Subject Property. Marchitelli concluded that "the sales comparison approach is the only applicable approach in developing a credible value opinion for Economic Unit A." Marchitelli did not consider the income approach because "properties like Unit A are most often purchased by owner-users" and "hypothetical investors of Unit A would be deterred

from purchasing it as an investment rental property because of the diversity of its physical features and functionality and depreciation issues and resulting lack of appeal to tenants." Marchitelli did not consider the cost approach because Unit A "is an older, non-specialized facility with significant depreciation[,]" and the cost approach is "particularly applicable when the property being appraised involves relatively new improvements which represent the highest and best use of the land or suffer only minor depreciation; or when relatively unique or specialized improvements are located on the site for which there are few improved sales of comparable properties."

The Commission extensively analyzed the five properties offered by Marchitelli as comparable properties to Unit A. The Commission found that only one of the properties–which had 200,000 more square feet of building area than Unit A's 1,700,000 square feet of building area–had a "similar amount" of square footage of building area to that of Unit A. Another property was "nearly 1 million square feet smaller than Unit A," and the remaining properties were "less than 529,000 square feet in size." The Commission also found that while the land area of Unit A was approximately 310 acres, the land area of the offered properties ranged from "approximately 183 acres for the largest, down to approximately 42 acres for the smallest." The Commission found further physical differences in the number of truck doors, ceiling heights, percentage of total building area dedicated to office space, and parking spaces between Unit A and the properties offered as comparable properties.

Despite the "significant quantitative differences in several of the physical characteristics that have been identified in the appraisal report as relevant to the value of Unit A, . . . every adjustment [Marchitelli] made to the comparable property sale prices is simply a 5% or 10% change, in a positive or negative direction." Furthermore, the Commission found that there was "little discussion of actual market evidence in support of the adjustments for differences in physical characteristics."

The County submitted an appraisal report prepared by Richard Brant. Brant divided the Subject Property into the following sub-elements: (1) primary building; (2) bedding facility; (3) truck facility; (4) sheds; (5) welcome center; and (6) pump houses. Brant appraised each sub-element using all three methods of valuation and reconciled the three values to state his final opinion of value, placing "only limited weight" on the income approach, "very little weight" on the cost approach, and "[c]onsiderable weight" on the sales comparison approach. The Commission found that "the appraisal report prepared for the County provides a greater number of options in support of its opinion, since all three approaches to value have been developed for each subelement of the subject property, whereas the appraisal prepared for the Appellant relies on a single approach to value for the subelements it considers."

The Commission found that Brant "relied on readily available market information for the subelements as an alternative to extracting less reliable information from sales of dissimilar properties that required substantial

adjustments[,]" and that although Brant "placed the greatest emphasis on the sales comparison approach," he "developed all three approaches to value for the subject as a test of the reasonableness of his conclusions." Brant offered four comparable properties for each of the Subject Property's subelements: the primary building, the bedding facility, the truck facility, and the sheds. The Commission did not address in detail the properties offered as comparable properties "because [it saw] some of the same issues raised by [Marchitelli's] report—for example, the lack of explanation for the positive and negative adjustments made to the sale prices, in addition to the broader range (negative 15% to positive 15%) of adjustments that are applied." What the Commission found "[m]ost puzzling, however, [was] the lack of explanation for the amount of the sale price allocated to land value." Due to the lack of evidence, the Commission "ultimately placed little emphasis on the sales comparison approach offered by the County."

The Commission next analyzed in depth Brant's appraisal developed using the income approach. The Commission ultimately concluded, "[T]here is insufficient evidence before us to enable us, as the report's readers, to evaluate the reasonableness of the opinion." Accordingly, the Commission "place[d] little weight on the income approach conclusions."

As a result of its in-depth analysis of both parties' experts' reports, the Commission found that "neither of the appraisal reports discussed provides a compelling conclusion of value." The Commission, therefore, based its determination

of value "upon all information received from the parties, rather than from a single party's opinion." Noting that its preference would be "to consider the sales of properties comparable to the subject property," the Commission specifically found that "the sale properties offered by the parties as comparable to the subject are not truly comparable, and cannot be made so without such adjustments and assumptions as to render them unreliable." The Commission thus "approach[ed] the determination of value for the remainder of the property by initially considering the income approach."

Brant testified before the Commission that the income approach was an appropriate method to value the Subject Property, "especially when you look at who the buyers and sellers are of these large modern distribution facilities[,]" and that there was adequate data to support his income approach valuation. Ronald Loftis, principal owner and appraiser of the Loftis Appraisal Company, also testified during the hearing. Loftis is a Member of the Appraisal Institute, Counselor of Real Estate, and licensed real estate broker. Loftis testified that appraisers are "given the opportunity to develop opinions of value based upon three approaches, and those approaches tend to triangulate. So if we look at those approaches, somewhere that value is going to fall within that triangle, you know, where cost, sales, and income are all going to bracket that triangle." He further testified that he would consider the income approach "even if it's an owner-occupied property," and that there was sufficient data to support a reliable valuation using the income approach.

There is no requirement that "any particular method of valuation be used at all times and in all places[,]" *In re Greens of Pine Glen Ltd.*, 356 N.C. at 648, 576 S.E.2d at 320, and the Commission was therefore not required as a matter of law to use any particular approach. The Commission thoroughly analyzed the evidence before it, clearly articulated its reasoning for not using the sales comparison approach and for using the income approach, and made its "determination of value . . . based upon all information received from the parties." The Commission's decision to use the income approach rather than the sales comparison approach to value the Subject Property was not arbitrary and is supported by competent, material, and substantial evidence in view of the whole record. Ashley's argument is overruled.

### 1. *Expenses and Obsolescence*

Ashley argues that the Commission erred by failing "to account for any expenses, functional or external obsolescence for the Subject Property." (capitalization altered).

The income approach does not require the appraiser to account for functional or economic obsolescence. Under the income approach, the appraiser "calculates the economic rent the property earns and deducts normal operating expenses" to derive the net operating income, which is then divided by a capitalization rate to "determine the fair market value of the property." *Fleming*, 112 N.C. App. at 583, 436 S.E.2d at 409 (citation omitted). It is the cost approach that requires the appraiser to deduct for depreciation, which may be caused "by obsolescence, which is an impairment of

desirability or usefulness brought about by changes in design standards (*functional obsolescence*) or factors external to the property (*economic obsolescence*)." *In re Stroh Brewery Co.*, 116 N.C. App. at 186, 447 S.E.2d at 807 (quotation marks and citations omitted). Because the Commission used the income approach, rather than the cost approach, to value the Subject Property, it was not required to account for functional or economic obsolescence.

### 2. *Capitalization Rate*

Ashley argues that "the Commission's utilization of an 8% capitalization rate is not supported by competent, material or substantial evidence." (capitalization altered).

In his appraisal report, Brant calculated a 6.5389% capitalization rate for the primary building and an 8.5584% capitalization rate for the bedding facility and truck facility. To calculate the capitalization rate for the primary building, Brant extracted implied capitalization rates from the sales of four similar properties, ranging from 6% to 7.1%. Brant relied on a Realty Rates Investor Survey to calculate the capitalization rate for the bedding facility and truck facility, which indicated that the capitalization rates for industrial warehouses and distribution centers ranged from 4.39% to 12.09%, with an average capitalization rate of 8.69%.

Given the Commission's duty to exercise judgment and discretion, the Commission was free to use a single capitalization rate for the entire Subject Property and make adjustments based on its finding that Brant did not adequately explain the

discrepancies between the capitalization rates for the primary building and the bedding and truck facilities. *See In re Blue Ridge Mall LLC*, 214 N.C. App. at 276, 713 S.E.2d at 787-88 (holding that the Commission did not err by adjusting the capitalization rate offered by the taxpayer's appraiser); *see also Albemarle Elec. Membership Corp. v. Alexander*, 282 N.C. 402, 408, 192 S.E.2d 811, 815 (1972) ("We find nothing in the record which indicates that the Board departed from the 'zone of reason' or acted arbitrarily in adopting the 6% capitalization rate.").

Accordingly, there is competent, material, and substantial evidence in view of the whole record to support the Commission's decision to use an 8% capitalization rate.

## B. Cost Approach

Ashley argues that the Commission erred by "failing to make required reductions under its cost approach for the Subject Property." (capitalization altered).

Here, the Commission made the following finding of fact:

> 56. Alternatively, the evidence indicates that the property was purchased by the Appellant for approximately $10,500,000 and then underwent renovations and new construction that were completed just prior to the appraisal date and cost at least $45,000,000 according to the Appellant's witness (a figure that may not include all costs), but $50,000,000 or more, according to the County's cost estimates. Accordingly, we find a value of $60,000,000 for 2018 to be supported by the cost approach, as well.

The Commission did not deduct for depreciation, as required by the cost approach. However, because the Commission's decision to use the income approach was not

arbitrary and is supported by competent, material, and substantial evidence in view of the whole record, and the Commission correctly applied the income approach, the substantial rights of Ashley have not been prejudiced by the Commission's finding. *See* N.C. Gen. Stat. § 105-345.2(b). Accordingly, any error in this finding does not require remand.

### III.    Conclusion

For the foregoing reasons, we affirm the Commission's final decision.

AFFIRMED.

Judges STROUD and WOOD concur.